# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| JOHN BRUGALETTA, et al., individually and on behalf of all others similarly situated, | Case No. _____ |
| Plaintiffs, | |
| v. | **CLASS ACTION COMPLAINT** |
| GENERAL MOTORS COMPANY, GENERAL MOTORS HOLDINGS LLC, and GENERAL MOTORS LLC, | **JURY TRIAL DEMANDED** |
| Defendants. | |

TABLE OF CONTENTS

Page

NATURE OF CLAIMS ................................................................1

JURISDICTION AND VENUE ...................................................7

THE PARTIES .............................................................................8

GENERAL FACTUAL ALLEGATIONS ..................................27

TOLLING OF THE STATUTE OF LIMITATIONS .................59

I.      Fraudulent Concealment .................................................59

II.     Estoppel ...........................................................................59

III.    Discovery Rule ................................................................60

CLASS ACTION ALLEGATIONS ...........................................60

I.      Numerosity ......................................................................62

II.     Predominance of Common Issues ...................................62

III.    Typicality ........................................................................65

IV.     Adequate Representation .................................................66

V.      Superiority .......................................................................66

REALLEGATION AND INCORPORATION BY REFERENCE .......................68

CLAIMS FOR RELIEF .............................................................69

COUNT 1 VIOLATION OF THE MAGNUSON-MOSS WARRANTY
        ACT, 15 U.S.C. § 2301 ET SEQ. .........................................69

COUNT 2 FRAUDULENT CONCEALMENT...........................74

COUNT 3 NEGLIGENCE ..........................................................78

COUNT 4 UNJUST ENRICHMENT..........................................80

COUNT 5 VIOLATION OF THE MICHIGAN CONSUMER
        PROTECTION ACT, MICH. COMP. LAWS §§ 445.903 *ET SEQ.* ...........81

COUNT 6 BREACH OF THE MICHIGAN IMPLIED WARRANTY OF
        MERCHANTABILITY, MICH. COMP. LAWS § 440.2314 ....................88

PRAYER FOR RELIEF ..............................................................90

DEMAND FOR JURY TRIAL ...................................................92

Plaintiffs, based on personal knowledge as to themselves, and upon information and belief as to all other matters, allege as follows:

## NATURE OF CLAIMS

1. The things meant to protect us should not be made in a way that harms or even kills us. This is particularly true of cars because they are a tool millions of people use every day. People trust that their cars were designed and built to keep them safe. And they expect that automakers (also known as "original equipment manufacturers" or "OEMs") take every reasonable step to make sure that nothing in their cars endangers the lives of those who ride in them.

2. This action concerns defective airbags manufactured by Takata Corporation and its related entities ("Takata"), which contain inflators using the notoriously volatile and unstable compound, ammonium nitrate, but which were nevertheless equipped in vehicles that Defendants and their related entities manufactured, sold or leased, or knowingly misrepresented as safe, when in fact they could explode and maim or kill drivers and passengers..

3. An airbag is a critical safety feature of any motor vehicle. Airbags are meant to prevent occupants from striking hard objects in the vehicle, such as the steering wheel, dashboard, or windshield. An airbag's inflator, as its name suggests, is supposed to rapidly inflate the airbag upon vehicle impact. In the milliseconds following a crash, the inflator ignites a propellant to produce gas that

is released into the airbag cushion, causing the airbag cushion to expand and deploy. The term "airbag" shall be used herein to refer to the entire airbag module, including the inflator.

4.      All Takata airbags at issue in this litigation share a common, uniform defect: the use of ammonium nitrate, a notoriously volatile and unstable compound, as the propellant in Defendants' defectively designed inflators (the "Inflator Defect"). Under ordinary conditions, including daily temperature swings and contact with moisture in the air, Takata's ammonium nitrate propellant transforms and destabilizes, causing irregular and dangerous behavior ranging from inertness to violent combustion. Ammonium nitrate is well-known for its explosive power. Indeed, it is the explosive that Timothy McVeigh and Terry Nichols used in April 1995 to bomb the Alfred P. Murrah Federal Building in downtown Oklahoma City. In 2006, a Takata factory suffered a severe explosion because of ammonium nitrate, a fact known to its OEM clients, including Defendants. In August 2016, a truck carrying Takata airbag parts crashed on a Texas road, detonating the ammonium nitrate in the truck in an immense blast, destroying a home, killing its elderly owner, and injuring four of her visitors.

5.      Because of the common, uniform Inflator Defect (i.e., the inherent instability of ammonium nitrate), Takata airbags often fail to perform as they should. Instead of protecting vehicle occupants from bodily injury during

- 2 -

accidents, the defective Takata airbags too often violently explode, sometimes expelling metal debris and shrapnel at drivers and passengers. As of July 2017, Takata airbags have been responsible for at least 12 deaths and 180 serious injuries in the United States alone.

6.     In the late 1990s, when Takata shelved a safer propellant in favor of the far cheaper ammonium nitrate, it was aware of these risks and did so over the objections and concerns of its engineers in Michigan. Tellingly, Takata is the only major airbag manufacturer that uses ammonium nitrate as the primary propellant in its airbag inflators.

7.     On information and belief, Defendants were intimately involved in the design and testing of the airbags that contained the Inflator Defect. When the Defendants approved Takata's airbags, and purchased them for installation in their vehicles, they were or should have been aware that the airbags used the volatile and unstable ammonium nitrate as the primary propellant in the inflators.

8.     Defendants' also knew or should have known that the Takata airbags were experiencing the same problems in other OEMs' vehicles. Takata and its OEM customers first received word of startling airbag failures in the field no later than 2003, when a Takata inflator ruptured in a BMW vehicle. Other ruptures and injuries took place in Honda vehicles in 2004 and 2007. After years of downplaying the danger, Honda issued a public recall in the United States in 2008,

putting all OEMs, including Defendants, on even greater notice of the danger. The alarm bells should have only grown louder in the coming years, as Honda and Takata issued further United States recalls of airbags with the Inflator Defect in 2009, 2010, 2011, and 2013, leading up to the record-breaking recalls that followed from 2014 onward. Yet, despite the repeated Takata/Honda recalls, Defendants utterly failed to take reasonable, let alone sufficient, measures to investigate or protect their purchasers and lessees, or the public.

9.      By May 2015, Takata had filed Defect Information Reports admitting the defect, and it would continue to add inflator models through additional DIRs in the coming years. Despite the overwhelming evidence of the defect, Defendants were not issuing recalls, warning consumers, or otherwise protecting them from the risk, for example through systematic loaner vehicle programs. The Defendants' delay is consequential-it exposes purchasers, lessees, drivers, passengers and, indeed, the general public, to ongoing and unnecessary risk of harm.

10.     Plaintiffs and consumers are in the frightening position of having to drive dangerous vehicles for many months or years while they wait for Defendants to replace the defective airbags in their cars. They are effectively left without a safe vehicle to take them to and from work, to pick up their children from school or childcare, or, in the most urgent situations, to transport themselves or someone else to a hospital.

11.    Even more troubling, many of the replacement airbags that Takata and the OEMs are using to "repair" recalled vehicles suffer from the same common, uniform defect that plagues the airbags being removed-they use unstable and dangerous ammonium nitrate as the propellant, a fact that Takata's representative admitted at a Congressional hearing in June 2015. Takata's representative also repeatedly refused to provide assurances that Takata's replacement air bags are safe and defect-free.

12.    Defendants knew, and certainly should have known, that the Takata airbags installed in millions of vehicles were defective. By concealing their knowledge of the nature and extent of the defect from the public, while continuing to advertise their products as safe and reliable, Defendants have shown a blatant disregard for public welfare and safety. Moreover, Defendants have violated their affirmative duty, imposed under the Transportation Recall Enhancement, Accountability, and Documentation Act (the "TREAD Act"), to promptly advise customers about known defects.

13.    As a result of this misconduct, Plaintiffs and members of the proposed Class were harmed and suffered actual damages.  Plaintiffs and the Class did not receive the benefit of their bargain; rather, they purchased or leased vehicles that are of a lesser standard, grade, and quality than represented, and they did not receive vehicles that met ordinary and reasonable consumer expectations regarding

safe and reliable operation. Purchasers or lessees of the Class Vehicles paid more, either through a higher purchase price or higher lease payments, than they would have had the Inflator Defect been disclosed. Plaintiffs and the Class were deprived of having a safe, defect-free airbag installed in their vehicles, and Defendants unjustly benefited from their unconscionable delay in recalling its defective products, as it avoided incurring the costs associated with recalls and installing replacement parts for many years.

14.    Plaintiffs and the Class also suffered damages in the form of out-of-pocket and loss-of-use expenses and costs, including but not limited to expenses and costs associated with taking time off from work, paying for rental cars or other transportation arrangements, and child care. Also, as a direct result of misconduct by Defendants, Plaintiffs and each Class member has or will have out-of-pocket economic damage by virtue of the time and expense of taking the time to bring their car in for repair.

15.    Plaintiffs and the Class also suffered damages as a result of Defendants' concealment and suppression of the facts concerning the safety, quality, and reliability of Defendants' vehicles with the defective Takata airbags. Defendants' false representations and omissions concerning the safety and reliability of those vehicles, and their concealment of the known safety defects

plaguing those vehicles and its brand, caused Plaintiffs and certain Class members to purchase or retain Defendants' vehicles of diminished value.

## JURISDICTION AND VENUE

16.    Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because members of the proposed Plaintiff Class are citizens of states different from Defendants' home states, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

17.    This Court has personal jurisdiction over Plaintiffs because Plaintiffs submit to the Court's jurisdiction. This Court has personal jurisdiction over Defendants because at least one is a resident of Michigan, and pursuant to Mich. Comp. Laws § 600.705, because Defendants transact substantial business in this District; some of the tortious acts or omissions giving rise to the Complaint took place in this District; and some of Plaintiff's claims arise out of Defendants operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state, committing a tortious act in this state, and causing injury to property in this state arising out of Defendants' acts and omissions outside this state; and at or about the time of such injuries Defendants were engaged in solicitation or service activities within this state, or products, materials, or things processed, serviced, or manufactured by Defendants

anywhere were used or consumed within this state in the ordinary course of commerce, trade, or use.

18.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to these claims occurred in this District, Defendants have caused harm to Class members residing in this District, and Defendants are residents of this District under 28 U.S.C. § 1391(c)(2) because they are subject to personal jurisdiction in this District.

## THE PARTIES

19.     General Motors LLC ("New GM") is a Delaware limited liability company with its principal place of business located at 300 Renaissance Center, Detroit, Michigan, and is a citizen of the States of Delaware and Michigan.  The sole member and owner of New GM is General Motors Holdings LLC.

20.     General Motors Holdings LLC ("GM Holdings") is a Delaware limited liability company with its principal place of business in Detroit, Michigan, and is a citizen of the States of Delaware and Michigan.  The sole member and owner of GM Holdings is General Motors Company.

21.     General Motors Company ("GM Parent") is a Delaware corporation with its principal place of business in Detroit, Michigan, and is a citizen of the States of Delaware and Michigan.  GM Parent's only asset is 100% ownership interest in GM Holdings.  In SEC filings, GM Parent states: "We [defined as GM

- 8 -

Parent] design, build and sell cars, trucks, crossovers and automobile parents worldwide." According to SEC filings, GM Parent sells vehicles "through [its] dealer network to retail customers." As stated in SEC filings, GM Parent is also responsible for determining when a recall should be conducted and for making reports to NHTSA.

22.    GM Parent and GM Holdings have complete domination and control over New GM.

23.    Defendants engineered, designed, developed, manufactured, and installed the Defective Airbags in the Class Vehicles (defined below), and approved the Defective Airbags for use in those vehicles. They also developed, reviewed, and approved the marketing and advertising campaigns designed to sell these Class Vehicles

24.    Plaintiff Sarie Bevins resides in Homer Glen, Illinois. Plaintiff owns a 2010 Cadillac Escalade Hybrid, which she purchased used on December 24, 2014 for $37,510.48 from Hubbard GM Center, Inc., a New GM dealership in Monticello, Indiana. Plaintiff Bevins viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of her vehicle and New GM vehicles generally. To Plaintiff Bevins's knowledge, the airbags in her vehicle have not been repaired or replaced. The value of Plaintiff's 2010 Cadillac Escalade Hybrid has been diminished as a result of the Inflator

Defect.  If Plaintiff had known about the Inflator Defect, she would have not purchased the vehicle, or would not have paid as much as she did for it.

25.    Plaintiff John Brugaletta resides in Petaluma, California.  Plaintiff Brugaletta owns a 2014 Chevrolet Silverado 1500, which he purchased new on June 11, 2014 for approximately $55,000 from Stewart Chevrolet, a New GM dealership in Colma, California.  To Plaintiff Brugaletta's knowledge, the airbags in his vehicle have not been repaired or replaced.  Plaintiff Brugaletta viewed advertisements and reviews on television and online that touted the safety and reliability of his vehicle and New GM vehicles generally.  The value of Plaintiff's 2014 Chevrolet Silverado 1500 has been diminished as a result of the Inflator Defect.  If Plaintiff had known about the Inflator Defect, he would have not purchased the vehicle, or would not have paid as much as he did for it.

26.    Plaintiff John Condon resides in Bronxville, New York.  Plaintiff owns a 2013 Chevrolet Silverado, which he purchased new on June 10, 2013 for approximately $26,500 from New Rochelle Chevrolet, a New GM dealership in New Rochelle, New York.  To Plaintiff Condon's knowledge, the airbags in his vehicle have not been repaired or replaced.  Plaintiff Condon viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of his vehicle and New GM vehicles generally.  In October 2017, Plaintiff Condon took his vehicle to a New GM dealership and asked if his

vehicle was subject to any recalls. Plaintiff Condon was told that there were no recalls for his 2013 Chevrolet Silverado. Plaintiff Condon currently does not allow anyone to sit in the passenger seat of his 2013 Chevrolet Silverado because he fears for their safety. The value of Plaintiff's 2013 Chevrolet Silverado has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he would have not purchased the vehicle, or would not have paid as much as he did for it.

27.    Plaintiff David Cox resides in Platte City, Missouri. Plaintiff David Cox owns a 2013 Chevrolet Silverado, which he purchased used on April 5, 2017 for approximately $36,900 from Victory Chevrolet, a New GM dealership in Savannah, Missouri. To his knowledge, the airbags in his vehicle have not been repaired or replaced. Plaintiff Cox originally researched another vehicle online and intended to purchase it. However, after seeing online and other print advertisements that the 2013 Chevrolet Silverado was safe and reliable and that New GM made safe and reliable vehicles, Plaintiff Cox instead decided to purchase the 2013 Chevrolet Silverado. The value of the 2013 Chevrolet Silverado has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he would have not purchased the vehicle, or would not have paid as much as he did for it.

28.    Plaintiff Kimberly Dominick resides in Latrobe, Pennsylvania. Plaintiff Dominick owns a 2012 GMC Sierra 1500 which she purchased used on April 6, 2015 for $31,482.29 from Jim Shorkey Family Auto Group, a New GM dealership in McKeesport, Pennsylvania.  Plaintiff Dominick viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of her vehicle and New GM vehicles generally.  To Plaintiff Dominick's knowledge, the airbags in her vehicle have not been repaired or replaced.  The value of Plaintiff Dominick's 2012 GMC Sierra 1500 has been diminished as a result of the Inflator Defect.  If Plaintiff had known about the Inflator Defect, she would have not purchased the vehicle, or would not have paid as much as she did for it.

29.    Plaintiff Kory Fugazzi resides in Kerrville, Texas.  Plaintiff Fugazzi owns a 2011 Chevrolet Suburban, which she purchased used in November of 2014 for approximately $27,000 from Crenwelge Motors in Kerrville, Texas.   To Plaintiff Fugazzi's knowledge, the airbags in her vehicle have not been repaired or replaced.  Plaintiff Fugazzi viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of her vehicle and New GM vehicles generally.   The value of Plaintiff's 2011 Chevrolet Suburban has been diminished as a result of the Inflator Defect.  If Plaintiff had

known about the Inflator Defect, she would have not purchased the vehicle, or would not have paid as much as she did for it.

30.    Plaintiff Ramand Giddings resides in Brooklyn, New York. Plaintiff Giddings owns a 2008 GMC Yukon Denali, which he purchased used on November 10, 2014 for $30,349.33 from EMG Auto Sales in Avenel, New Jersey. To Plaintiff Giddings's knowledge, the airbags in his vehicle have not been repaired or replaced. Plaintiff Giddings viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of his vehicle and GM vehicles generally. In July 2017, Plaintiff Giddings became aware of the Inflator Defect and called the dealership three times in an attempt to have the airbag replaced but received no answer. The value of Plaintiff's 2008 GMC Yukon Denali has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he would have not purchased the vehicle, or would not have paid as much as he did for it.

31.    Plaintiff Judith Gross resides in Coudersport, Pennsylvania. Plaintiff Gross owns a 2011 GMC Sierra HD which she purchased new on June 2, 2011 for $41,597.76 from Rick Bokman Buick GMC Cadillac, a New GM dealership in Olean, New York. Plaintiff Gross viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of her vehicle and New GM vehicles generally. To Plaintiff Gross's knowledge, the

airbags in her vehicle have not been repaired or replaced.  The value of Plaintiff Gross's 2011 GMC Sierra HD has been diminished as a result of the Inflator Defect.  If Plaintiff had known about the Inflator Defect, she would have not purchased the vehicle, or would not have paid as much as she did for it.

32.    Plaintiff Clyde Holmes resides in Natchez, Missouri.    Plaintiff Holmes owns a 2009 GMC Sierra, which he purchased used on May 3, 2014 for approximately $21,000 at Toyota of Brookhaven in Brookhaven, Missouri.  To Plaintiff Holmes's knowledge the airbags in his vehicle have not been repaired or replaced.  Plaintiff Holmes viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of his vehicle and GM vehicles generally.  The value of Plaintiff's 2009 GMC Sierra has been diminished as a result of the Inflator Defect.  If Plaintiff had known about the Inflator Defect, he would have not purchased the vehicle, or would not have paid as much as he did for it.

33.    Plaintiff April Hughes-Cox resides in Platte City, Missouri.  Plaintiff April Hughes-Cox owns a 2012 GMC Sierra HD, which she purchased used on February 14, 2017 for approximately $21,000 from Morris Auto in Belton, Missouri.  To her knowledge, the airbags in her vehicle have not been repaired or replaced. Plaintiff Cox viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of her vehicle

and New GM vehicles generally. The value of the 2012 GMC Sierra HD has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she would have not purchased the vehicle, or would not have paid as much as she did for it.

34.     Plaintiff Donovan J. Jacobs resides in Alpine, California. Plaintiff Jacobs owns a 2011 Chevrolet Tahoe, which he purchased new on October 13, 2010 for $40,351.00 from Mark Christopher Auto Center, a New GM dealership in Ontario, California using carsdirect.com. To Plaintiff Jacobs's knowledge, the airbags in his 2011 Chevrolet Tahoe were never repaired or replaced. Plaintiff Jacobs viewed or heard commercials and reviews through television, radio, and the internet, including on Chevrolet's website, that touted the safety and reliability of his vehicle and New GM vehicles generally. The value of Plaintiff's 2011 Chevrolet Tahoe has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he would have not purchased the vehicle, or would not have paid as much as he did for it.

35.     Plaintiff Marlene S. Karu resides in West Orange, New Jersey. Plaintiff Karu owns a 2008 Saab 9-3 Convertible, which she purchased used on August 26, 2010 for approximately $26,000 from Reinertsen Motors, a Saab dealership located in Denville, New Jersey. To the best of Plaintiff's knowledge, the airbags in her Saab were replaced in or around May 2017, when she brought

her vehicle in for service after receiving a Safety Recall indicating that the parts were available to repair her vehicle. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she would not have purchased the 2008 Saab 9-3 Convertible or would not have paid as much as she did for it.

36.     Plaintiff Vicky Keen resides in Bristol, Virginia. Plaintiff Keen owns a 2011 Chevrolet Silverado 1500, which she purchased used on March 30, 2015 for approximately $28,900 from Courtesy Chevrolet, a New GM dealership in King Sport, Tennessee. To Plaintiff Keen's knowledge, the airbags in her vehicle have not been repaired or replaced. Plaintiff Keen viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of her vehicle and New GM vehicles generally. The value of Plaintiff's 2011 Chevrolet Silverado LD has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she would have not purchased the vehicle, or would not have paid as much as she did for it.

37.     Plaintiff Dyeshawn Lodge resides in Powder Springs, Georgia. Plaintiff Lodge owns a 2010 Chevrolet Suburban which she purchased used on September 22, 2011 for $29,930.67 from Hennessy Buick GMC, a New GM dealership in Morrow, Georgia. Plaintiff Lodge viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and

reliability of her vehicle and New GM vehicles generally.  To Plaintiff Lodge's knowledge, the airbags in her vehicle have not been repaired or replaced.  The value of Plaintiff Lodge's 2010 Chevrolet Suburban has been diminished as a result of the Inflator Defect.  If Plaintiff had known about the Inflator Defect, she would have not purchased the vehicle, or would not have paid as much as she did for it.

38.    Plaintiff Michael David McBride resides in Marshall, Michigan.  Plaintiff McBride owns a 2007 Chevrolet Avalanche LT, which he purchased used in 2017 for approximately $16,000 from a used vehicle dealership, Cedar Car Company in Cedar Springs, Michigan.  Upon information and belief, Cedar Car Company is owned by Sparta Chevrolet, a New GM dealership in Sparta, Michigan.  To Plaintiff McBride's knowledge, the airbags in his 2007 Chevrolet Avalanche LT were never repaired or replaced.  Plaintiff McBride researched the 2007 Chevrolet Avalanche LT before purchasing and found advertisements that touted the safety and reliability of his vehicle and GM vehicles generally.  The value of Plaintiff's 2007 Chevrolet Avalanche LT has been diminished as a result of the Inflator Defect.  If Plaintiff had known about the Inflator Defect, he would have not purchased the vehicle, or would not have paid as much as he did for it.

39.    Plaintiff Gordon McFarland resides in Webberville, Michigan.  Plaintiff McFarland owns a 2013 GMC Sierra 1500 which he purchased used in

2016 for approximately $20,000 from Sundance Buick GMC, a New GM dealership in Saint Johns, Michigan. To Plaintiff McFarland's knowledge, the airbags in his vehicle have not been repaired or replaced. Plaintiff McFarland viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of her vehicle and New GM vehicles generally. The value of Plaintiff's 2013 GMC Sierra 1500 has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he would have not purchased the vehicle, or would not have paid as much as he did for it.

40.    Plaintiff Calaundra Miller resides in Yazoo City, Mississippi. Plaintiff owns a 2011 Chevrolet Silverado, which was purchased used in March 2015 for $27,029.50 from Joe Machen's Autogroup in Columbia, Missouri. To Plaintiff Miller's knowledge, the airbags in her 2011 Chevrolet Silverado have not been repaired or replaced. Plaintiff Miller viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of her vehicle and New GM vehicles generally. The value of Plaintiff's 2011 Chevrolet Silverado has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she would have not purchased the vehicle, or would not have paid as much as she did for it.

41.    Plaintiff Kenneth Morgan resides in Trafford, Pennsylvania. Plaintiff owns a 2009 GMC Sierra 1500, which he purchased new on September 26, 2009 for approximately $45,000 from Joe Ball GMC & Pre-Owned Superstore in Glenshaw, Pennsylvania.  Plaintiff also owns a 2012 Chevrolet Tahoe that he purchased new on April 28, 2012 for approximately $56,019 from Kenny Ross Chevy Buick GMC in North Huntingdon, Pennsylvania.  Prior to purchasing his vehicles, Plaintiff Morgan viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of his vehicles and New GM vehicles generally.  To Plaintiff Morgan's knowledge, the airbags in his vehicles have not been repaired or replaced.  The value of Plaintiff's 2009 GMC Sierra 1500 and 2012 Chevrolet Tahoe has been diminished as a result of the Inflator Defect.  If Plaintiff had known about the Inflator Defect, he would have not purchased the vehicles, or would not have paid as much he did for them.

42.    Plaintiff Muehl resides in Tampa, Florida.  Plaintiff Muehl owns a 2014 GMC Sierra, which he purchased used on August 11, 2014 for approximately $40,000 from Handy Chevrolet, a New GM dealership in St. Albans, Vermont.  To Plaintiff Muehl's knowledge, his airbags have been replaced.  Plaintiff Muehl viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of his vehicle and New GM vehicles generally.  The value of Plaintiff's 2014 GMC Sierra has been diminished as a

result of the Inflator Defect.  If Plaintiff had known about the Inflator Defect, he would have not purchased the vehicle, or would not have paid as much as he did for it.

43.    Plaintiff Kolmon Nemes Jr. resides in Bayville, New Jersey.  Plaintiff Nemes owns a 2008 Chevrolet Tahoe Hybrid, which he purchased used on February 23, 2015 for approximately $14,975.00 from Automotive Avenues, LLC in Wall, New Jersey.  To his knowledge, the airbags in his 2008 Chevrolet Tahoe Hybrid were never repaired or replaced.  The value of Plaintiff's 2008 Chevrolet Tahoe Hybrid has been diminished as a result of the Inflator Defect.  Prior to purchasing the vehicle, Plaintiff Nemes did not receive notice of the Defective Airbags or Inflator Defect.  If Plaintiff had known about the Inflator Defect, he would have not purchased the vehicle, or would not have paid as much as he did for it.

44.    Plaintiff Ralph Wayne Packett resides in Haynesville, Virginia.  Plaintiff Packett owns a 2011 GMC Sierra, which he purchased used in 2012 for approximately $18,000 from Northern Neck Chevrolet, a New GM dealership in Montross, Virginia.  To Plaintiff Packett's knowledge, the airbags in his 2011 GMC Sierra were never repaired or replaced.  Plaintiff Packett viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of his vehicle and New GM vehicles generally.  The value of

Plaintiff's 2011 GMC Sierra has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he would have not purchased the vehicle, or would not have paid as much as he did for it.

45.     Plaintiff Gene Paleno resides in Granada Hills, California.  Plaintiff Paleno owned a 2007 GMC Yukon Denali XL, which he purchased used for approximately $30,000 on or around July 8, 2011 in a private party sale in California.  To Plaintiff Paleno's knowledge, the airbags in his vehicle have not been repaired or replaced.  Plaintiff Paleno viewed or heard commercials and reviews through television, radio, print advertisements, and the internet that touted the safety and reliability of his vehicle and GM vehicles generally.  Plaintiff Paleno received a recall notice for his airbags in July 2016.  After receiving the recall notice, Plaintiff Paleno has requested a repair at every service appointment, only to be told by the dealership that there are no parts available for his vehicle.  The value of Plaintiff's 2007 GMC Yukon Denali XL has been diminished as a result of the Inflator Defect.  If Plaintiff had known about the Inflator Defect, he would have not purchased the vehicle, or would not have paid as much as he did for it.

46.     Plaintiff Jay Riojas resides in Atascadero, California.  Plaintiff Riojas owns a 2011 Chevrolet Tahoe, which he purchased new on June 8, 2011 for $56,713.84 from Courtesy Chevrolet Center, a New GM dealership in San Diego, California.  Plaintiff Riojas viewed or heard commercials and reviews through

television, radio, and the internet that touted the safety and reliability of his vehicle and New GM vehicles generally.  To Plaintiff Riojas's knowledge, the airbags in his 2011 Chevrolet Tahoe were never repaired or replaced.  On December 7, 2017, Plaintiff Riojas contacted Paso Robles Chevrolet about the Inflator Defect recalls. The service agent at the dealership informed Plaintiff Riojas that they were aware of the recalls but there was nothing that could be done about the recalls until they received authorization from New GM.  The value of Plaintiff's 2011 Chevrolet Tahoe has been diminished as a result of the Inflator Defect.  If Plaintiff had known about the Inflator Defect, he would have not purchased the vehicle, or would not have paid as much as he did for it.

47.    Plaintiffs Tommy and Mary Rivers reside in Alpine, Alabama.  The Rivers Plaintiffs own a 2009 Chevrolet Avalanche, which they purchased new in November 2009 for $34,000.00 from Harbin Chevrolet in Scottsboro, Alabama. To the Rivers Plaintiffs' knowledge, the airbags in their 2009 Chevrolet Avalanche have never been repaired or replaced. The value of their 2009 Chevrolet Avalanche has been diminished as a result of the Inflator Defect. If the Rivers Plaintiffs had known about the Inflator Defect, they would not have purchased the 2009 Chevrolet Avalanche or would not have paid as much as they did for it.

48.    Plaintiff Leonard Shinhoster resides in Monroe, North Carolina. Plaintiff Shinhoster owns a 2010 GMC Yukon XL C1500 SLT, which he

- 22 -

purchased used on January 15, 2015 for $20,239.24 from Keith Hawthorne Hyundai in Gastonia, North Carolina. To Plaintiff Shinhoster's knowledge, the airbags in his vehicle have not been repaired or replaced. Plaintiff Shinhoster viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of his vehicle and New GM vehicles generally. The value of Plaintiff's 2010 GMC Yukon XL C1500 SLT has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he would have not purchased the vehicle, or would not have paid as much as he did for it.

49.    Plaintiff Tarus Sibley resides in Ponchatoula, Louisiana. Plaintiff owns a 2007 GMC Sierra 1500, which he purchased used in or around 2013 for approximate $21,000 from Ross Downing Buick GMC, a New GM dealership in Hammond, Louisiana. Plaintiff viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of his vehicle and New GM vehicles generally. To Plaintiff's knowledge, the airbags in his vehicle have not been repaired or replaced. The value of Plaintiff's 2007 GMC Sierra 1500 has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he would have not purchased the vehicle, or would not have paid as much as he did for it.

50.     Plaintiff Arkil Truss resides in Sharon, Mississippi.  Plaintiff owns a 2007 GMC Sierra 1500, which he purchased used in or around March 2014 for $21,000 from CS Auto Sales in Jackson, Mississippi. Plaintiff viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of his vehicle and New GM vehicles generally.  To Plaintiff's knowledge, the airbags in his vehicle have not been repaired or replaced.  The value of Plaintiff's 2007 GMC Sierra 1500 has been diminished as a result of the Inflator Defect.  If Plaintiff had known about the Inflator Defect, he would have not purchased the vehicle, or would not have paid as much as he did for it.

51.     Plaintiff Tremain Willis resides in Avon, Indiana.  Plaintiff owns a 2007 GMC Yukon XL, which he purchased used in or around 2015 for $15,000 from Paducah Ford in Paducah, Kentucky.  Plaintiff viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of his vehicle and New GM vehicles generally.  To Plaintiff's knowledge, the airbags in his vehicle have not been repaired or replaced.  The value of Plaintiff's 2007 GMC Yukon XL has been diminished as a result of the Inflator Defect.  If Plaintiff had known about the Inflator Defect, he would have not purchased the vehicle, or would not have paid as much as he did for it.

52.     Plaintiff Craig Wise resides in Picayune, Mississippi.  Plaintiff Wise owns a 2007 GMC Yukon XL, which he purchased used on or around July 10,

2014, from Walt Massey Automotive in Lucedale, Mississippi for approximately $13,300. In addition, Plaintiff Wise owns a 2009 GMC Sierra 2500, which he purchased used on or around August 28, 2015, for approximately $17,000 from Alpine Motors, a New GM dealership in Alexandria, Louisiana. Plaintiff Wise viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of his vehicles and GM vehicles generally. To Plaintiff Wise's knowledge, the airbags in both of his vehicles have not been repaired or replaced. The value of Plaintiff Wise's 2007 GMC Yukon XL and 2009 GMC Sierra 2500 have been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he would have not purchased the vehicles, or would not have paid as much as he did for them.

53.    Plaintiff Jay Wymer resides in Winfield, West Virginia. Plaintiff Wymer owns a 2011 Chevrolet Silverado, which he purchased used in 2012 for approximately $18,000 from Mike Ferrell Toyota in Logan County, West Virginia. To his knowledge, the airbags in his 2011 Chevrolet Silverado were never repaired or replaced. Plaintiff Wymer viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of his vehicle and New GM vehicles generally. The value of Plaintiff Wymer's 2011 Chevrolet Silverado has been diminished as a result of the Inflator Defect. If Plaintiff had

known about the Inflator Defect, he would have not purchased the vehicle, or would not have paid as much as he did for it.

54.    Plaintiffs and the proposed Class were harmed and suffered actual damages. The defective Takata airbags significantly diminish the value of the vehicles in which they are installed. Such vehicles have been stigmatized as a result of being recalled and equipped with Takata airbags, and the widespread publicity of the Inflator Defect.

55.    Further, Plaintiffs and the proposed Class did not receive the benefit of their bargain; rather, they purchased and leased vehicles that are of a lesser standard, grade, and quality than represented, and they did not receive vehicles that met ordinary and reasonable consumer expectations regarding safe and reliable operation. Plaintiffs and the Class, either through a higher purchase price or higher lease payments, paid more than they would have had the Inflator Defect been disclosed. Plaintiffs and the Class were deprived of having a safe, defect-free airbag installed in their vehicles, and Defendants unjustly benefited from their unconscionable delay in recalling their defective products, as they avoided incurring the costs associated with recalls and installing replacement parts for many years.

56.    Plaintiffs and the proposed Class also suffered damages in the form of out-of-pocket and loss-of-use expenses and costs, including but not limited to

expenses and costs associated with taking time off from work, paying for rental cars or other transportation arrangements, and child care.

57.     The defective Takata airbags create a dangerous condition that gives rise to a clear, substantial, and unreasonable danger of death or personal injury to Plaintiffs and the proposed Class.

## GENERAL FACTUAL ALLEGATIONS

58.     Plaintiffs brings this action on behalf of themselves and all persons similarly situated who purchased or leased Class Vehicles (defined below). Plaintiffs seek redress individually and on behalf of those similarly situated for economic losses stemming from Defendants' manufacture, sale or lease, and false representations concerning the defective airbags in the Class Vehicles, including but not limited to diminished value.  Plaintiffs, on behalf of themselves and those similarly situated, seek to recover damages and statutory penalties, and injunctive relief/equitable relief.

59.     Class Vehicles" refers to all vehicles in the United States that have Defective Airbags (defined below) that were (1) manufactured, sold, distributed, or leased by Defendants or (2) manufactured, sold, distributed, or leased by Old GM and purchased or leased by a Plaintiff or Class member after July 10, 2009.

60.     "Defective Airbags" refers to all airbag modules (including inflators) manufactured by Takata ("Takata airbags") that use ammonium nitrate as the

propellant in their inflators (the "Inflator Defect"), including (a) all airbags subject to the recalls identified below; (b) all Takata airbags in Defendants' vehicles subject to recalls relating to Takata's May 18, 2015 DIRs, the Coordinated Remedy Order issued by NHTSA in *In re Docket No. NHTSA-2015-0055 Coordinated Remedy Program Proceeding*, and amendments thereto, concerning Takata's ammonium-nitrate inflators, and the Consent Order issued by NHTSA in *In re EA 15-001 Air Bag Inflator Rupture*, and any amendments thereto; and all Takata airbags in Defendants' vehicles subject to any subsequent expansion of pre-existing recalls, new recalls, amendments to pre-existing DIRs, or new DIRs, announced prior to the date of an order granting class certification, relating to the tendency of such airbags to over-aggressively deploy or rupture.

61.    All Defective Airbags contain the Inflator Defect. As a result of the Inflator Defect, Defective Airbags have an unreasonably dangerous tendency to: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; and/or (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag.

62.    The following table identifies, to the best of Plaintiff's understanding and without the benefit of discovery, the vehicles either recalled or scheduled to be recalled by Defendants, and which of the front airbags were included in the recall for each vehicle (driver, passenger, or both):

| Recall Date[1] | NHTSA Recall Nos. | Make | Model | Model Years | Zones | Airbag |
|---|---|---|---|---|---|---|
| 6/26/2014 | 14V372 | Chevrolet | Cruze | 2013-2014 | N/A | Driver |
| 5/28/2015 | 15V324 | GMC | Sierra HD | 2007-2008 | HAH, Non-HAH[2] | Passenger |
| 5/28/2015 | 15V324 | Chevrolet | Silverado HD | 2007-2008 | HAH, Non-HAH | Passenger |
| 10/16/2015 | 15V666 | Chevrolet | Camaro | 2015 | N/A | Side |
| 10/16/2015 | 15V666 | Chevrolet | Equinox | 2015 | N/A | Side |
| 10/16/2015 | 15V666 | Buick | LaCrosse | 2015 | N/A | Side |
| 10/16/2015 | 15V666 | Chevrolet | Malibu | 2015 | N/A | Side |
| 10/16/2015 | 15V666 | GMC | Terrain | 2015 | N/A | Side |
| 10/16/2015 | 15V666 | Cadillac | XTS | 2015 | N/A | Side |
| 2/3/2016 | 16V063 | Saab | 9-3 | 2006-2011 | N/A | Driver |
| 2/3/2016 | 16V063 | Saab | 9-5 | 2006-2009 | N/A | Driver |
| 2/3/2016 | 16V063 | Saturn | Astra | 2008-2009 | N/A | Driver |
| 5/27/2016 | 16V381, 16V383 | Chevrolet | Avalanche | 2007-2008 | A, B[3] | Passenger |

---

[1] Future recall dates are based on the schedule announced by NHTSA, available at https://www.nhtsa.gov/takata-air-bags/takata-recall-expansion-what-consumers-need-know (last visited Dec. 5, 2017).

[2] Originally sold or ever registered in any U.S. state not included in the HAH zone, and the District of Columbia.

[3] Originally sold or ever registered in Arizona, Arkansas, Delaware, District of Columbia, Illinois, Indiana, Kansas, Kentucky, Maryland, Missouri, Nebraska, Nevada, New Jersey, New Mexico, North Carolina, Ohio, Oklahoma, Pennsylvania, Tennessee, Virginia, and West Virginia.

| Recall Date[1] | NHTSA Recall Nos. | Make | Model | Model Years | Zones | Airbag |
|---|---|---|---|---|---|---|
| 5/27/2016 | 16V381 | Chevrolet | Avalanche | 2009-2011 | A | Passenger |
| 5/27/2016 | 16V381, 16V383 | Cadillac | Escalade | 2007-2008 | A, B | Passenger |
| 5/27/2016 | 16V381 | Cadillac | Escalade | 2009-2011 | A | Passenger |
| 5/27/2016 | 16V381, 16V383 | Cadillac | Escalade ESV | 2007-2008 | A, B | Passenger |
| 5/27/2016 | 16V381 | Cadillac | Escalade ESV | 2009-2011 | A | Passenger |
| 5/27/2016 | 16V381, 16V383 | Cadillac | Escalade EXT | 2007-2008 | A, B | Passenger |
| 5/27/2016 | 16V381 | Cadillac | Escalade EXT | 2009-2011 | A | Passenger |
| 5/27/2016 | 16V381 | GMC | Sierra HD | 2009-2011 | A | Passenger |
| 5/27/2016 | 16V381, 16V383 | GMC | Sierra LD | 2007-2008 | A, B | Passenger |
| 5/27/2016 | 16V381 | GMC | Sierra LD | 2009-2011 | A | Passenger |
| 5/27/2016 | 16V381 | Chevrolet | Silverado HD | 2009-2011 | A | Passenger |
| 5/27/2016 | 16V381, 16V383 | Chevrolet | Silverado LD | 2007-2008 | A, B | Passenger |
| 5/27/2016 | 16V381 | Chevrolet | Silverado LD | 2009-2011 | A | Passenger |
| 5/27/2016 | 16V381, 16V383 | Chevrolet | Suburban | 2007-2008 | A, B | Passenger |
| 5/27/2016 | 16V381 | Chevrolet | Suburban | 2009-2011 | A | Passenger |

| Recall Date[1] | NHTSA Recall Nos. | Make | Model | Model Years | Zones | Airbag |
|---|---|---|---|---|---|---|
| 5/27/2016 | 16V381, 16V383 | Chevrolet | Tahoe | 2007-2008 | A, B | Passenger |
| 5/27/2016 | 16V381 | Chevrolet | Tahoe | 2009-2011 | A | Passenger |
| 5/27/2016 | 16V381, 16V383 | GMC | Yukon | 2007-2008 | A | Passenger |
| 5/27/2016 | 16V381 | GMC | Yukon | 2009-2011 | A, B | Passenger |
| 5/27/2016 | 16V381, 16V383 | GMC | Yukon XL | 2007-2008 | A, B | Passenger |
| 5/27/2016 | 16V381 | GMC | Yukon XL | 2009-2011 | A | Passenger |
| 1/10/2017 | 17V021 | Chevrolet | Avalanche | 2007-2008 | C | Passenger |
| 1/10/2017 | 17V019 | Chevrolet | Avalanche | 2009 | B | Passenger |
| 1/10/2017 | 17V010 | Chevrolet | Avalanche | 2012 | A | Passenger |
| 1/10/2017 | 17V021 | Cadillac | Escalade | 2007-2008 | C | Passenger |
| 1/10/2017 | 17V019 | Cadillac | Escalade | 2009 | B | Passenger |
| 1/10/2017 | 17V010 | Cadillac | Escalade | 2012 | A | Passenger |
| 1/10/2017 | 17V021 | Cadillac | Escalade ESV | 2007-2008 | C | Passenger |
| 1/10/2017 | 17V019 | Cadillac | Escalade ESV | 2009 | B | Passenger |
| 1/10/2017 | 17V010 | Cadillac | Escalade ESV | 2012 | A | Passenger |
| 1/10/2017 | 17V021 | Cadillac | Escalade EXT | 2007-2008 | C | Passenger |

| Recall Date[1] | NHTSA Recall Nos. | Make | Model | Model Years | Zones | Airbag |
|---|---|---|---|---|---|---|
| 1/10/2017 | 17V019 | Cadillac | Escalade EXT | 2009 | B | Passenger |
| 1/10/2017 | 17V010 | Cadillac | Escalade EXT | 2012 | A | Passenger |
| 1/10/2017 | 17V019 | GMC | Sierra HD | 2009 | B | Passenger |
| 1/10/2017 | 17V010 | GMC | Sierra HD | 2012 | A | Passenger |
| 1/10/2017 | 17V021 | GMC | Sierra LD | 2007-2008 | C | Passenger |
| 1/10/2017 | 17V019 | GMC | Sierra LD | 2009 | B | Passenger |
| 1/10/2017 | 17V010 | GMC | Sierra LD | 2012 | A | Passenger |
| 1/10/2017 | 17V019 | Chevrolet | Silverado HD | 2009 | B | Passenger |
| 1/10/2017 | 17V010 | Chevrolet | Silverado HD | 2012 | A | Passenger |
| 1/10/2017 | 17V021 | Chevrolet | Silverado LD | 2007-2008 | C | Passenger |
| 1/10/2017 | 17V019 | Chevrolet | Silverado LD | 2009 | B | Passenger |
| 1/10/2017 | 17V010 | Chevrolet | Silverado LD | 2012 | A | Passenger |
| 1/10/2017 | 17V021 | Chevrolet | Suburban | 2007-2008 | C | Passenger |
| 1/10/2017 | 17V019 | Chevrolet | Suburban | 2009 | B | Passenger |
| 1/10/2017 | 17V010 | Chevrolet | Suburban | 2012 | A | Passenger |
| 1/10/2017 | 17V021 | Chevrolet | Tahoe | 2007-2008 | C | Passenger |
| 1/10/2017 | 17V019 | Chevrolet | Tahoe | 2009 | B | Passenger |
| 1/10/2017 | 17V010 | Chevrolet | Tahoe | 2012 | A | Passenger |

| Recall Date[1] | NHTSA Recall Nos. | Make | Model | Model Years | Zones | Airbag |
|---|---|---|---|---|---|---|
| 1/10/2017 | 17V021 | GMC | Yukon | 2007-2008 | C | Passenger |
| 1/10/2017 | 17V019 | GMC | Yukon | 2009 | B | Passenger |
| 1/10/2017 | 17V010 | GMC | Yukon | 2012 | A | Passenger |
| 1/10/2017 | 17V021 | GMC | Yukon XL | 2007-2008 | C | Passenger |
| 1/10/2017 | 17V019 | GMC | Yukon XL | 2009 | B | Passenger |
| 1/10/2017 | 17V010 | GMC | Yukon XL | 2012 | A | Passenger |
| 1/2/2018 | 18E003 | Chevrolet | Avalanche | 2009 | C | Passenger |
| 1/2/2018 | 18E002 | Chevrolet | Avalanche | 2010 | B | Passenger |
| 1/2/2018 | 18E001 | Chevrolet | Avalanche | 2013 | A | Passenger |
| 1/2/2018 | 18E003 | Cadillac | Escalade | 2009 | C | Passenger |
| 1/2/2018 | 18E002 | Cadillac | Escalade | 2010 | B | Passenger |
| 1/2/2018 | 18E001 | Cadillac | Escalade | 2013 | A | Passenger |
| 1/2/2018 | 18E003 | Cadillac | Escalade ESV | 2009 | C | Passenger |
| 1/2/2018 | 18E002 | Cadillac | Escalade ESV | 2010 | B | Passenger |
| 1/2/2018 | 18E001 | Cadillac | Escalade ESV | 2013 | A | Passenger |
| 1/2/2018 | 18E003 | Cadillac | Escalade EXT | 2009 | C | Passenger |
| 1/2/2018 | 18E002 | Cadillac | Escalade EXT | 2010 | B | Passenger |
| 1/2/2018 | 18E001 | Cadillac | Escalade EXT | 2013 | A | Passenger |
| 1/2/2018 | 18E003 | GMC | Sierra HD | 2009 | C | Passenger |
| 1/2/2018 | 18E002 | GMC | Sierra HD | 2010 | B | Passenger |

| Recall Date[1] | NHTSA Recall Nos. | Make | Model | Model Years | Zones | Airbag |
|---|---|---|---|---|---|---|
| 1/2/2018 | 18E001 | GMC | Sierra HD | 2013 | A | Passenger |
| 1/2/2018 | 18E003 | GMC | Sierra LD | 2009 | C | Passenger |
| 1/2/2018 | 18E002 | GMC | Sierra LD | 2010 | B | Passenger |
| 1/2/2018 | 18E001 | GMC | Sierra LD | 2013 | A | Passenger |
| 1/2/2018 | 18E003 | Chevrolet | Silverado HD | 2009 | C | Passenger |
| 1/2/2018 | 18E002 | Chevrolet | Silverado HD | 2010 | B | Passenger |
| 1/2/2018 | 18E001 | Chevrolet | Silverado HD | 2013 | A | Passenger |
| 1/2/2018 | 18E003 | Chevrolet | Silverado LD | 2009 | C | Passenger |
| 1/2/2018 | 18E002 | Chevrolet | Silverado LD | 2010 | B | Passenger |
| 1/2/2018 | 18E001 | Chevrolet | Silverado LD | 2013 | A | Passenger |
| 1/2/2018 | 18E003 | Chevrolet | Suburban | 2009 | C | Passenger |
| 1/2/2018 | 18E002 | Chevrolet | Suburban | 2010 | B | Passenger |
| 1/2/2018 | 18E001 | Chevrolet | Suburban | 2013 | A | Passenger |
| 1/2/2018 | 18E003 | Chevrolet | Tahoe | 2009 | C | Passenger |
| 1/2/2018 | 18E002 | Chevrolet | Tahoe | 2010 | B | Passenger |
| 1/2/2018 | 18E001 | Chevrolet | Tahoe | 2013 | A | Passenger |
| 1/2/2018 | 18E003 | GMC | Yukon | 2009 | C | Passenger |
| 1/2/2018 | 18E002 | GMC | Yukon | 2010 | B | Passenger |
| 1/2/2018 | 18E001 | GMC | Yukon | 2013 | A | Passenger |
| 1/2/2018 | 18E003 | GMC | Yukon XL | 2009 | C | Passenger |
| 1/2/2018 | 18E002 | GMC | Yukon XL | 2010 | B | Passenger |

| Recall Date[1] | NHTSA Recall Nos. | Make | Model | Model Years | Zones | Airbag |
|---|---|---|---|---|---|---|
| 1/2/2018 | 18E001 | GMC | Yukon XL | 2013 | A | Passenger |
| On or about 12/31/2018 | N/A | Chevrolet | Avalanche | 2010 | C | Passenger |
| On or about 12/31/2018 | N/A | Chevrolet | Avalanche | 2011-2013 | B, C | Passenger |
| On or about 12/31/2018 | N/A | Cadillac | Escalade | 2010 | C | Passenger |
| On or about 12/31/2018 | N/A | Cadillac | Escalade | 2011-2013 | B, C | Passenger |
| On or about 12/31/2018 | N/A | Cadillac | Escalade | 2014 | A, B, C | Passenger |
| On or about 12/31/2018 | N/A | Cadillac | Escalade ESV | 2010 | C | Passenger |
| On or about 12/31/2018 | N/A | Cadillac | Escalade ESV | 2011-2013 | B, C | Passenger |
| On or about 12/31/2018 | N/A | Cadillac | Escalade ESV | 2014 | A, B, C | Passenger |
| On or about 12/31/2018 | N/A | Cadillac | Escalade EXT | 2010 | C | Passenger |
| On or about 12/31/2018 | N/A | Cadillac | Escalade EXT | 2011-2013 | B, C | Passenger |

| Recall Date[1] | NHTSA Recall Nos. | Make | Model | Model Years | Zones | Airbag |
|---|---|---|---|---|---|---|
| On or about 12/31/2018 | N/A | GMC | Sierra HD | 2010 | C | Passenger |
| On or about 12/31/2018 | N/A | GMC | Sierra HD | 2011-2013 | B, C | Passenger |
| On or about 12/31/2018 | N/A | GMC | Sierra HD | 2014 | A, B, C | Passenger |
| On or about 12/31/2018 | N/A | GMC | Sierra LD | 2010 | C | Passenger |
| On or about 12/31/2018 | N/A | GMC | Sierra LD | 2011-2013 | B, C | Passenger |
| On or about 12/31/2018 | N/A | Chevrolet | Silverado HD | 2010 | C | Passenger |
| On or about 12/31/2018 | N/A | Chevrolet | Silverado HD | 2011-2013 | B, C | Passenger |
| On or about 12/31/2018 | N/A | Chevrolet | Silverado HD | 2014 | A, B, C | Passenger |
| On or about 12/31/2018 | N/A | Chevrolet | Silverado LD | 2010 | C | Passenger |
| On or about 12/31/2018 | N/A | Chevrolet | Silverado LD | 2011-2013 | B, C | Passenger |

| Recall Date[1] | NHTSA Recall Nos. | Make | Model | Model Years | Zones | Airbag |
|---|---|---|---|---|---|---|
| On or about 12/31/2018 | N/A | Chevrolet | Suburban | 2010 | C | Passenger |
| On or about 12/31/2018 | N/A | Chevrolet | Suburban | 2011-2013 | B, C | Passenger |
| On or about 12/31/2018 | N/A | Chevrolet | Suburban | 2014 | A, B, C | Passenger |
| On or about 12/31/2018 | N/A | Chevrolet | Tahoe | 2010 | C | Passenger |
| On or about 12/31/2018 | N/A | Chevrolet | Tahoe | 2011-2013 | B, C | Passenger |
| On or about 12/31/2018 | N/A | Chevrolet | Tahoe | 2014 | A, B, C | Passenger |
| On or about 12/31/2018 | N/A | GMC | Yukon | 2010 | C | Passenger |
| On or about 12/31/2018 | N/A | GMC | Yukon | 2011-2013 | B, C | Passenger |
| On or about 12/31/2018 | N/A | GMC | Yukon | 2014 | A, B, C | Passenger |
| On or about 12/31/2018 | N/A | GMC | Yukon XL | 2010 | C | Passenger |

| Recall Date[1] | NHTSA Recall Nos. | Make | Model | Model Years | Zones | Airbag |
|---|---|---|---|---|---|---|
| On or about 12/31/2018 | N/A | GMC | Yukon XL | 2011-2013 | B, C | Passenger |
| On or about 12/31/2018 | N/A | GMC | Yukon XL | 2014 | A, B, C | Passenger |

63. As recently as January 2018, Defendants and Takata announced additional large recalls, identified as 18E-001, -002, and -003.

64. The part of the airbag at issue in this matter is the inflator. The inflator consists of a metal canister loaded with propellant wafers or pellets, and is placed in the airbag module. Upon impact, the propellant wafers or pellets ignite, triggering a chemical reaction that produces gas, which in turn inflates the fabric airbag. This process occurs within milliseconds.

65. The following basic illustration, included earlier in this Complaint as well, depicts Takata's airbag module:



66.   When it began manufacturing airbags in the 1980s, Takata used sodium azide as the propellant within its inflators. In the mid-1990s, Takata began using a different propellant called 5-aminotetrazole, in part due to toxicity issues associated with sodium azide.

67.   In the late-1990s, Takata's managers pressured its engineers in Michigan to devise a lower cost propellant based upon ammonium nitrate, a compound used in fertilizer and explosives.

68.   In 1999, as the ammonium nitrate design was being considered, Takata's engineering team in Moses Lake, Washington, raised objections and

pointed to explosives manuals that warned of the risk of disintegration and irregular, overly-energetic combustion. As one former Takata engineer noted, "ammonium nitrate stuck out like a sore thumb," and yet his team had only "a couple days" to do its review.

69.    In fact, ammonium nitrate is an inherently volatile and unstable chemical. Daily temperature swings are large enough for the ammonium nitrate to cycle through three of its five crystalline states, adding to its volatility. It also readily absorbs moisture from the atmosphere. The chemical's sensitivity to temperature and moisture cause it to break down over time, which can lead to unpredictable and dangerous results, such as violent detonation or the chemical becoming effectively inert. As one explosives expert bluntly stated in *The New York Times*, ammonium nitrate "shouldn't be used in airbags," and is better suited to large demolitions in mining and construction.

70.    From the time it began investigating ammonium nitrate in the late 1990s, Takata understood these risks and often expressed them publicly. It stated in a 1995 patent document that ammonium nitrate propellant would be vulnerable to temperature changes and that its casing "might even blow up." Takata further recognized that "[o]ne of the major problems with the use of ammonium nitrate is that it undergoes several crystalline phase changes," one of which occurs at approximately 90 degrees Fahrenheit. If ammonium nitrate undergoes this type of

temperature change, the compound may "expand and contract and change shape resulting in growth and cracking" of the propellant, which might cause an airbag inflator to "not operate properly or might even blow up because of the excess pressure generated."

71.    Takata further admitted in a 1999 patent document that pure ammonium nitrate is "problematic" because many gas generating compositions made with it are "thermally unstable."

72.    Similarly, in a 2006 patent application, Takata discussed the need to test the performance of ammonium nitrate at various extreme temperatures because it is an unstable chemical, and these tests could reveal many problems, including "over-pressurization of the inflator leading to rupture." The 2006 patent document purportedly contained a fix for that sort of rupturing. Notably, the alleged fix in 2006 came *after* a rupture incident in 2004 that caused a serious injury, and incidents continued to mount after that time as well. Takata submitted a patent application with other purported "fixes" as recently as 2013. These ongoing, albeit unsuccessful, efforts show that Takata knew throughout the relevant period that its airbags were defective.

73.    In a 2007 patent for allegedly phase stabilized ammonium nitrate that incorporates a scavenging additive designed to retain moisture in an effort to prevent these catastrophic ruptures, Takata representatives noted the following:

> Without the addition of the [additive], and as shown in [the patent], the ballistic curves indicate that changes occurred in the gas generant after 50 cycles. After 100 cycles the ballistic performance was very aggressive and did not meet USCAR specification. After 200 cycles the ballistic performance was so aggressive the ballistic performance was so aggressive that the inflator ruptured due to extremely high internal pressures.

74.    Thus, Takata's inflators were "grenades" in the glove box or steering wheel waiting to detonate after going through 100 or 200 cycles of thermal cycling, which, of course, is something cars in the real world will eventually do.

75.    The use of this additive (or any other) designed to address ammonium nitrate's hygroscopic nature (affinity for moisture) is, at best, a temporary fix because at some point the additive will no longer be able to absorb the excess moisture and the ballistic curves will again exceed specification leading to ruptures.

76.    The only conceivable "advantage" to the compound for an airbag manufacturer and its OEM clients, according to the expert quoted in *The New York Times*, is that it is "cheap, unbelievably cheap." Takata had originally planned to use tetrazole as its propellant, which is not only more stable than ammonium nitrate, but also yields other desired benefits, such as being more environmentally friendly. But tetrazole was too expensive for Takata, and executives ultimately pressured engineers in Michigan to develop a cheaper alternative.

77.    Not surprisingly, other major airbag manufacturers, including Autoliv and Key Safety Systems have reportedly avoided using ammonium nitrate as a propellant. Takata's representative confirmed at a Congressional hearing in June 2015 that Takata is the only major airbag manufacturer that uses ammonium nitrate as a primary propellant in its inflators.

78.    Takata and Defendants became further aware of the instability of its ammonium nitrate propellant from the persistent and glaring quality control problems Takata encountered in its manufacturing operations. The Takata plants that manufactured the airbags and inflators at issue in this Complaint include plants located in Moses Lake, Washington, LaGrange, Georgia, and Monclova, Mexico. Defendants routinely visited and audited Takata operations, including in response to quality and safety concerns.

79.    Starting in 2001, engineers at Takata's Monclova, Mexico plant identified a range of problems, including rust, which they said could have caused inflators to fail. Between 2001 and 2003, Takata struggled with at least 45 different inflator problems, according to dozens of internal reports titled "potential failures" and reviewed by *Reuters*. On at least three occasions between 2005 and 2006, Takata engineers struggled to eliminate leaks found in inflators, according to engineering presentations. In 2005, Shainin, a U.S. consulting firm, found a pattern of additional problems.

80.     Underscoring Takata's reckless use of the volatile and unstable ammonium nitrate, on March 31, 2006, the Monclova, Mexico plant was rocked by violent explosions in containers loaded with propellant. Defendants were well aware of this explosion, as detailed in § III, *infra*.

81.     Apparently, not even that terrible accident could prompt serious and lasting improvements: in a February 2007 email to multiple colleagues, one manager stated that "[t]he whole situation makes me sick," referring to Takata's failure to implement checks it had introduced to try to keep the airbags containing the unstable and volatile ammonium nitrate propellant from failing.

82.     Takata engineers also scrambled as late as 2009 to address its propellant issues after "inflators tested from multiple propellant lots showed aggressive ballistics," according to an internal presentation in June 2009.

83.     Based on internal Takata documents, Takata was struggling to meet a surge in demand for its airbags. Putting profits ahead of safety, Takata exhibited shoddy and reckless behavior in the handling of its ammonium nitrate propellant. In March 2011, a Takata supervisor at the Monclova, Mexico plant sent an e-mail to other employees stating "A part that is not welded = one life less, which shows we are not fulfilling the mission." The title of the e-mail was "Defectos y defectos y defectos!!!!" This shoddy and reckless attitude permeated all of Takata's operations and facilities.

84.    Yet handling problems at Takata facilities persisted: another manager urged employees to examine the propellant visible in a cross section of an airbag inflator, noting that "[t]he propellant arrangement inside is what can be damaged when the airbags are dropped. . . . Here you can see why it is important to handle our product properly." A 2009 presentation of guidelines on handling inflators and airbag units also stressed the dangers of mishandling them. The presentation included a link to a video that appeared to show side-curtain airbags deploying violently, sending the inflator hurtling into the car's cabin.

85.    Despite knowing it was shipping potentially deadly products, including inflators containing unstable and volatile ammonium nitrate propellant, Takata resisted taking back damaged or wet airbag modules, in part because Takata struggled to keep up with a surge in demand for its airbags through the early- and mid-2000s as it won big new clients.

86.    On information and belief, at all relevant times, Defendants exercised close control over suppliers, including airbag and airbag inflator suppliers. On information and belief, Defendants prepared and maintained design specifications for both the airbag and inflator, which suppliers like Takata were and are required to meet. On information and belief, given its general control over its suppliers, Defendants knew or should have known, prior to approving the Defective Airbags that Takata used an ammonium nitrate propellant in its inflators.

87.    Old GM had knowledge of the Inflator Defect before it purchased a single airbag from Takata.  According to the *New York Times*, in the late 1990s, Takata, then a little-known Japanese supplier, contacted Old GM and offered to supply Old GM with a much cheaper automotive airbag.  Attracted to Takata's lower prices, Old GM turned to its existing airbag supplier—the Swedish-American company Autoliv—and asked it to match Takata's cheaper design or risk losing the automaker's business.  When Autoliv's scientists studied the Takata airbag, they learned that it utilized the dangerously volatile compound, ammonium nitrate.

88.    Robert Taylor, Autoliv's head chemist at the time, analyzed every facet of the Takata airbag, including the propellant, ammonium nitrate.  The takeaway, he said, was that when the airbag was detonated, "the gas generated so fast, it blows the inflator to bits."  Chris Hock, a former member of Mr. Taylor's team, said a mock ammonium nitrate inflator test "totally destroyed the fixture" and "turned it into shrapnel."

89.    The former Autoliv scientists considered their verdict against the use of ammonium nitrate irrefutable and alerted Old GM to the dangers of equipping its vehicles with Takata's airbags.  According to Mr. Taylor, no later than 1999, Autoliv specifically told Old GM, "No, we can't do it, we're not going to use [ammonium nitrate]."  Mr. Taylor and Mr. Hock said Autoliv was so concerned

about the use of ammonium nitrate that Autoliv likewise warned other manufacturers of the dangers of using Takata's airbag.

90.    Old GM began equipping its vehicles with Takata's airbags in the early 2000s in the face of Autoliv's warning about ammonium nitrate.

91.    In June 2009, Old GM filed for bankruptcy.  On July 5, 2009, under Section 363 of the U.S. Bankruptcy Code, the United States Bankruptcy Court for the Southern District of New York approved the sale of substantially all of Old GM's  assets pursuant to a Master Sale and Purchase Agreement ("Sale Agreement").  The Sale Agreement officially closed on July 10, 2009, by which New GM acquired substantially all of Old GM's  books, records, and personnel.

92.    In addition to the knowledge of the Inflator Defect inherited from Old GM through acquired books, records, and personnel, Defendants independently knew or should have known of the Inflator Defect almost immediately after the closing of the 363 Sale.

93.    Further, any cursory attention paid to Takata's track record should have further fueled Defendants' concern over ammonium nitrate inflators. Takata airbags made it to market in model year 2001. By 2003, there were two ruptures, including one that lead to a fatality in Arizona, and another that took place in a vehicle manufactured by BMW. The BMW incident took place in Switzerland and was jointly investigated by BMW and Takata.

94.    Additional, alarming incidents continued to mount regularly, including a rupture in 2004 in Alabama, and a trio of incidents in the summer of 2007. These four incidents took place in Honda vehicles, and notably, Honda filed a standard report with U.S. safety regulators for each of them.

95.    Had they acted as reasonable OEMs, Defendants would have kept abreast of information submitted by a major OEM about a key supplier to a key regulator. Moreover, by November 2008—well after Defendants had accumulated significant knowledge regarding the troubling risks of Takata airbags—Honda issued its first public recall in the United States. The recall notice expressly noted the risk that Takata airbags "could produce excessive internal pressure," causing "the inflator to rupture," spraying metal fragments through the airbag cushion ("2008 Recall"). Coupled with their ongoing concerns over this precise risk, Defendants had every obligation to act swiftly to protect their past and prospective consumers, and yet they did not.

96.    Tragically, this failure would then be repeated serially over the next five years. Following the 2008 Honda recall, yet additional ruptures took place, many causing accidents, injuries, and/or fatalities. By 2009, Honda had issued its second recall in the United States, putting all OEMs, including Defendants, on still further notice of the airbag defect. This pattern of incidents and recalls continued

unabated—with increasingly large recalls of Takata airbags issued in 2010, 2011, and 2013—and yet prompted no response from Defendants.

97.    On April 11, 2013, Takata filed a DIR titled "Certain Airbag Inflators Used as Original Equipment." While it sought to cabin the scope of the problem, it again openly admitted concerns over propellant moisture absorption and deterioration, and "over-aggressive combustion" and inflator "rupture." Shortly thereafter, six major automakers, including Nissan, Mazda, BMW, Pontiac, and Honda, issued recalls of 3.6 million vehicles containing Takata airbags. Defendants, by contrast, remained silent.

98.    Defendants' silence persisted as other OEMs drastically increased their recalls in 2014. By the end of June 2014, the number of vehicles recalled due to the Inflator Defect had increased to over 6 million, which would ultimately only be a small fraction of the total recall. And, with public knowledge of the defect growing, the number of rupture-related injuries and fatalities continued to grow as well. In the summer and fall of 2014 alone, seven incidents were widely reported, including unsuspecting individuals who died, were rendered quadriplegic, and suffered severe head injuries. That pace continued in the years to come.

99.    By November 18, 2014, it was clear to NHTSA that even the extensive recalls to date were insufficient. NHTSA therefore demanded a national

recall of many OEMs, and began speaking out more forcefully against OEMs' endless delay and intransigence in the face of a deadly risk.

100.    In light of ongoing testing, on May 18, 2015, Takata filed four DIRs with NHTSA and agreed to a Consent Order regarding its (1) PSDI, PSDI-4, and PSDI-4K driver air bag inflators; (2) SPI passenger air bag inflators; (3) PSPI-L passenger air bag inflators; and (4) PSPI passenger air bag inflators, respectively. Takata admitted that "a defect related to motor vehicle safety may arise in some of the subject inflators." In testimony presented to Congress following the submission of its DIRs, Takata's representative admitted that the use of ammonium nitrate is a factor that contributes to the tendency of Takata's airbags to rupture, and that as a result, Takata will phase out the use of ammonium nitrate.

101.    As a result of Takata's admission that its inflators are defective, the total number of recalled vehicles nationwide will exceed 40 million.

102.    Over the past 15 years that Defendants, OEMs, and their supplier have known there was a problem with the safety of their airbags, there have been at least 12 deaths and 180 injuries linked to the Defective Airbags nationwide. Globally, the numbers are even larger. As detailed above, the incidents date back to at least 2003, and involve vehicles made by numerous OEMs. Defendants knew of the Inflator Defect by virtue of these incidents—among many other sources of knowledge—but failed to disclose the nature and scope of the Inflator Defect.

- 50 -

103.   The Defendants were on further notice due to additional, unusual Takata airbag deployments that should have prompted further inquiry into the airbags' fitness for use. A review of publicly-available NHTSA complaints shows dozens of incidents of Takata airbags inadvertently deploying in the Class Vehicles, events that may be tied to the unstable and volatile ammonium nitrate propellant. These complaints started as early as September 2005, and involve vehicles manufactured by Acura, BMW, Dodge, Ford, Mitsubishi, Pontiac, Subaru, and Toyota. Some of these incidents showed still further signs of the Inflator Defect, including airbags that deployed with such force that they caused the windshield to crack, break, or shatter, and others that caused unusual smoke and fire (or both).

104.   At all relevant times, in advertisements and promotional materials, Defendants continuously maintained that their vehicles were safe and reliable, while uniformly omitting any reference to the Inflator Defect. Plaintiffs, directly or indirectly, viewed or heard such advertisements or promotional materials prior to purchasing or leasing Class Vehicles. The misleading statements about Class Vehicles' safety in Defendants' advertisements and promotional materials were material to decisions to purchase or lease Class Vehicles.

105.   Examples of Defendants' safety and reliability representations include the following.

a.      In 2017, Defendants' website stated: "Safety is always our priority.  It's the main concern with each and every car we design and a driving principle of our company."

b.      In a February 2015 news release, Defendants advertised high rankings in a J.D. Power Vehicle Dependability Study for several models subject to the Inflator Defect recalls.  The news release highlighted the GMC Sierra (which is subject to the Inflator Defect recalls) for becoming "the first full-size pickup to receive the highest-possible five-star Overall Vehicle Score for safety."

c.      In December 2014, Defendants issued a news release touting the Insurance Institute for Highway Safety (IIHS)'s designation of four Chevrolet vehicle models as "Top Safety Picks," including some models subject to recalls due to the Inflator Defect.

d.      During a presentation at the May 2014 North American Conference on Elderly Mobility, Gay Kent (General Motors Director of Global Vehicle Safety) stated: "The safety of all our customers is our utmost concern."

e.       GM Parent's 2013 Annual Report asserts: "Nothing is more important than the safety of our customers."

f.      In a July 10, 2012 news release, Chris Perry (Chevrolet Global Vice President of Marketing) stated: "We think customers who have been driving competitive makes or even older Chevrolets will be very pleased by today's

Chevrolet designs, easy-to-use technologies, comprehensive safety and the quality built into all of our cars, trucks and crossovers."

g.      An April 2012 New GM national advertising campaign slogan proclaimed: "Safety. Utility. Performance."

h.      Defendants published on their website a December 27, 2011 interview with Gay Kent (General Motors Executive Director of Vehicle Safety and Crashworthiness) who stated:   "Our safety strategy is about providing continuous protection for our customers before, during and after a crash. . . . We design safety and crashworthiness into our vehicles very early in development."  In the interview, Kent touted "GM's own internal requirements for vehicle safety and crashworthiness, which go above and beyond federal requirements."

i.      The promotional brochure for New GM's 2011 Cadillac Escalade series noted: "Passenger safety is a primary consideration throughout the engineering process."  It also advised potential customers: "A look beneath the beautiful exterior reveals a comprehensive approach to safety."

j.      An August 29, 2011 advertisement on Defendants' website stated: "Chevrolet provides consumers with fuel-efficient, safe and reliable vehicles that deliver high quality, expressive design, spirited performance and value."

k.     New GM's brochure for the 2010 Chevy Avalanche called the truck a "Four-Wheel Bodyguard" in connection with its airbags and "all-encompassing approach to safety."  This model is subject to the Inflator Defect recalls.

l.     On November 10, 2010, New GM published a video that told consumers that New GM actually prevents any defects from reaching consumers. The video, entitled "Andy Danko: The White Glove Quality Check," explains that there are "quality processes in the plant that prevent any defects from getting out."

m.     Ed Whitacre, GM Parent Chairman and CEO, stated in an April 2010 video advertisement that New GM was "designing, building, and selling the best cars in the world," and New GM has "unmatched lifesaving technology" to keep customers safe.

n.     In its 2010 Annual Report, GM Parent proclaimed its products would "improve safety and enhance the overall driving experience for our customers."

106.   Contrary to these representations and countless others like them, Defendants failed to equip the Class Vehicles with airbags that would meet these standards, and they failed to disclose to consumers that their vehicles actually contained dangerous and defective airbags.

107.   Even those vehicles that have been recalled have little chance of being repaired in the near term. Under the recalls required under NHTSA's Coordinated Remedy Order, approximately 44 million vehicles will be recalled in the United States due to the Inflator Defect.

108.   At a Congressional hearing in June 2015, Takata's representative testified that Takata was shipping approximately 700,000 replacement inflators per month, and expected to increase production to 1 million replacement inflators per month by September 2015 – well short of the number required to supply the ten automakers that have issued recalls.

109.   At the current rate, it will take several years to produce enough Takata inflators to fix all recalled vehicles in the U.S., even setting aside the question of whether service departments would be able to provide the necessary services in a timely manner.

110.   Not surprisingly, authorized dealers are experiencing a severe shortage of parts to replace the faulty airbags.  Dealers have been telling frustrated car owners they can expect to wait many months before their airbags can be replaced.

111.   In response to the airbag replacement shortage, certain automakers have taken the extreme step of disabling passenger airbags entirely and putting a "Do Not Sit Here" decal in the vehicle until a proper repair can be made.  In the

alternative, some automakers are advising customers to refrain from driving their vehicles until the airbags can be replaced.

112.  Other automakers have also chosen to "repair" their customers' vehicles not by providing temporary replacement vehicles or replacement parts, but by disengaging the Takata airbags entirely.

113.  Congress has voiced concerns about this serious problem. Senators Richard Blumenthal and Edward J. Markey, in a letter to the Department of Transportation (DOT), said they were:

> [A]larmed and astonished that NHTSA has endorsed a policy recently announced by Toyota and GM that dealers should disable passenger-side airbags and instruct against permitting passengers in the front seat if replacement parts for these airbags are unavailable.  As a matter of policy, this step is extraordinarily troubling and potentially dangerous. As a matter of law . . . §30122(b) of the Motor Vehicle Safety Act (49 U.S.C.) prohibits a manufacturer from knowingly making a safety device inoperable unless the [DOT] issues a specific exemption. We are unaware of an exemption from your office in the case of Takata airbags.

114.  The Class Vehicles are not safe to drive. They have been recalled, and yet replacement of the Defective Airbags could take years. Due to Defendants' failures, Plaintiffs and Class members are left with poor options: be without use of a vehicle; purchase, lease, or rent a new vehicle until Defendants complete the recall; or use a vehicle with a dangerous or disabled airbag over an extended period of time.

115.   As Senators Blumenthal and Markey further asserted, "all drivers deserve access to loaners or rental cars at no cost to them while they await repairs to their cars that make them safe enough to drive again."

116.   Yet, Defendants are not providing loaner or replacement vehicles on a comprehensive basis.

117.   Perhaps most alarming, the replacement components manufactured by Takata that many OEMs, potentially including Defendants, are using to "repair" recalled Class Vehicles suffer from the same Inflator Defect that plagues the parts being removed: they use ammonium nitrate as the inflator's primary propellant. Indeed, Takata admitted in its submitted DIRs and at the June 2015 Congressional hearing that inflators installed in recalled vehicles as replacement parts are, in fact, defective and must be replaced yet again. And even recall notices issued in 2015 acknowledge that certain "replacement inflators are of the same design and materials as the inflators being replaced."

118.   Moreover, inspection of inflators manufactured by Takata as recently as 2014 and installed by manufacturers through the recall process reveals that the ammonium nitrate pellets within the inflators already show signs of moisture-induced instability, such as rust stains, the tendency to clump together, and size variations.   As a result, Takata cannot reasonably assure Plaintiffs or Class

members that Class Vehicles equipped with such post-recall replacement parts will be any safer than they were with the initial Defective Airbags.

119.  By way of example, Paragraph 30 of the November 2015 Consent Order provides that the NHTSA Administrator may issue final orders for the recall of Takata's desiccated phase stabilized ammonium nitrate ("PSAN") inflators, used as both original and replacement equipment, if no root cause has been determined by Takata or any other credible source, or if Takata has not otherwise shown the safety and/or service life of the parts by December 31, 2019.  But as of July 10, 2017, Takata began recalling certain desiccated PSAN inflators installed in Ford, Mazda and Nissan vehicles.

120.  Moreover, while Takata and automakers had previously assured the public that the Defective Airbags had been remedied and that the new airbags being placed in recalled vehicles were safe, in fact, several automakers have been or will be required to recall some vehicles from model year 2013 and later because of the risk of the Takata airbags rupturing.  And Takata has now admitted that replacement airbags installed in some recalled vehicles are defective as well, and cannot assure the public that replacement inflators containing ammonium nitrate are safe and not prone to rupture.

## TOLLING OF THE STATUTE OF LIMITATIONS

### I.    Fraudulent Concealment

121.   Upon information and belief, Defendants have known of the Inflator Defect in the Defective Airbags since at least July 10, 2009 when New GM acquired substantially all of Old GM's  books, records, and personnel, and the knowledge about the defective Takata airbags those books, records, and personnel held. Defendants have concealed from or failed to notify Plaintiffs, Class members, and the public of the full and complete nature of the Inflator Defect.

122.   Although Defendants may have now acknowledged to safety regulators that Takata's airbags are defective, for years, Defendants did not fully investigate or disclose the seriousness of the issue and in fact downplayed the widespread prevalence of the problem.

123.   Any applicable statute of limitations has therefore been tolled by Defendants' knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

### II.    Estoppel

124.   Defendants were and are under a continuous duty to disclose to Plaintiffs and Class members the true character, quality, and nature of the Class Vehicles. They actively concealed the true character, quality, and nature of the vehicles and knowingly made misrepresentations about the quality, reliability,

characteristics, and performance of the vehicles. Plaintiffs and Class members reasonably relied upon Defendants' knowing and affirmative misrepresentations and/or active concealment of these facts. Based on the foregoing, Defendants are estopped from relying on any statute of limitations in defense of this action.

## III.   **Discovery Rule**

125.   The causes of action alleged herein did not accrue until Plaintiffs and Class members discovered that their vehicles had the Defective Airbags.

126.   Plaintiffs and Class members, however, had no realistic ability to discern that the vehicles were defective until—at the earliest—after either the Defective Airbag exploded or their vehicles were recalled. And even then, Plaintiffs and Class members had no reason to discover their causes of action because of Defendants' active concealment of the true nature of the defect.

## **CLASS ACTION ALLEGATIONS**

127.   The Class's claims all derive directly from a single course of conduct by Defendants. This case is about the responsibility of Defendants, at law and in equity, for their knowledge, their conduct, and their products. Defendants have engaged in uniform and standardized conduct toward the Class. They did not differentiate, in degree of care or candor, in their actions or inactions, or in the content of their statements or omissions, among individual Class members. The objective facts on these subjects are the same for all Class members. Within each

Claim for Relief asserted by the respective Class, the same legal standards govern.

Additionally, many states, and for some claims all states, share the same legal

standards and elements of proof, facilitating the certification of multistate or

nationwide Class for some or all claims. Accordingly, Plaintiffs bring this lawsuit

as a class action on their own behalf and on behalf of all other persons similarly

situated as members of the proposed Class pursuant to Federal Rules of Civil

Procedure 23(a) and (b)(3) and/or (b)(2) and/or (c)(4). This action satisfies the

numerosity, commonality, typicality, adequacy, predominance, and superiority

requirements of those provisions.

128.   Plaintiffs bring this action and seek to certify and maintain it as a class

action under Rules 23(a); (b)(2); and/or (b)(3); and/or c(4) of the Federal Rules of

Civil Procedure on behalf of themselves and a national Class defined as follows:

> All persons in the United States who, prior to the date on
> which the Class Vehicle was recalled and after July 10,
> 2009, (a) entered into a lease for a Class Vehicle, or (b)
> bought a Class Vehicle and (i) still own or lease the Class
> Vehicle, or (ii) sold the Class Vehicle after the date on
> which the Class Vehicle was recalled, or (iii) following
> an accident, whose Class Vehicle was declared a total
> loss after the date on which the Class Vehicle was
> recalled.

129.   Excluded from the Class are Takata and Defendants, their employees,

officers, directors, legal representatives, heirs, successors and wholly or partly

owned subsidiaries or affiliates of Defendants; Class Counsel and their employees;

and the judicial officers and their immediate family members and associated court staff assigned to this case.  In addition, any claims concerning Pontiac Vibe or Saab 9-2X vehicles released in connection with the Settlement with the Toyota Defendants in *In re Takata Products Liability Litigation*, MDL 2599, are excluded.

## I.     Numerosity

130.   This action satisfies the requirements of Fed. R. Civ. P. 23(a)(1). There are millions of Class Vehicles nationwide, and thousands of Class Vehicles in each of the States. Individual joinder of all Class members is impracticable.

131.   The Class is ascertainable because its members can be readily identified using registration records, sales records, production records, and other information kept by Defendants or third parties in the usual course of business and within their control.   Plaintiffs anticipate providing appropriate notice to each certified Class, in compliance with Fed. R. Civ. P. 23(c)(1)(2)(A) and/or (B), to be approved by the Court after class certification, or pursuant to court order under Fed. R. Civ. P. 23(d).

## II.     Predominance of Common Issues

132.   This action satisfies the requirements of Fed. R. Civ. P. 23(a)(2) and 23(b)(3) because questions of law and fact that have common answers that are the same for each of the respective Class predominate over questions affecting only individual Class members. These include, without limitation, the following:

       a.     Whether the Class Vehicles suffer from the Inflator Defect;

       b.     Whether Defendants knew or should have known about the Inflator Defect, and, if so, how long Defendants have known of the defect;

       c.     Whether Defendants had a duty to disclose the defective nature of the Class Vehicles to Plaintiffs and Class members;

       d.     Whether Defendants omitted and failed to disclose material facts about the Class Vehicles;

       e.     Whether Defendants' concealment of the true defective nature of the Class Vehicles induced Plaintiffs and Class members to act to their detriment by purchasing the Class Vehicles;

       f.     Whether Defendants' conduct tolls any or all applicable limitations periods by acts of fraudulent concealment, application of the discovery rule, or equitable estoppels;

       g.     Whether Defendants misrepresented that the Class Vehicles were safe;

       h.     Whether Defendants engaged in unfair, deceptive, unlawful and/or fraudulent acts or practices in trade or commerce by failing to disclose that the Class Vehicles were designed, manufactured, and sold with defective airbag inflators;

i.      Whether Defendants' conduct, as alleged herein, was likely to mislead a reasonable consumer;

j.      Whether Defendants' statements, concealments and omissions regarding the Class Vehicles were material, in that a reasonable consumer could consider them important in purchasing, selling, maintaining, or operating such vehicles;

k.      Whether Defendants violated each of the States' consumer protection statutes, and if so, what remedies are available under those statutes;

l.      Whether the Class Vehicles were unfit for the ordinary purposes for which they were used, in violation of the implied warranty of merchantability;

m.      Whether Defendants' unlawful, unfair, and/or deceptive practices harmed Plaintiffs and the Class;

n.      Whether the Class Vehicles have suffered a diminution of value because of the Defective Airbags;

o.      Whether Defendants have been unjustly enriched by their conduct;

p.      Whether Plaintiffs and the Class are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction;

- 64 -

q.    Whether Plaintiffs and the Class are entitled to a declaratory judgment stating that the airbag inflators in the Class Vehicles are defective and/or not merchantable;

r.    Whether Defendants should be declared responsible for notifying all Class members of the Inflator Defect and ensuring that all vehicles with the airbag inflator defect are promptly recalled and repaired;

s.    What aggregate amounts of statutory penalties are sufficient to punish and deter Defendants and to vindicate statutory and public policy;

t.    How such penalties should be most equitably distributed among Class members;

u.    Whether certain Defendants associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

**III.    <u>Typicality</u>**

133.   This action satisfies the requirements of Fed. R. Civ. P. 23(a)(3) because Plaintiff's claims are typical of the claims of the Class members, and arise from the same course of conduct by Defendants. The relief Plaintiffs seek is typical of the relief sought for the absent Class members.

IV.    **Adequate Representation**

134.   Plaintiff swill fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel with substantial experience in prosecuting consumer class actions, including actions involving defective products.

135.   Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class, and have the financial resources to do so. Neither Plaintiffs nor their counsel has interests adverse to those of the Class.

V.    **Superiority**

136.   This action satisfies the requirements of Fed. R. Civ. P. 23(b)(2) because Defendants have acted and refused to act on grounds generally applicable to each Class, thereby making appropriate final injunctive and/or corresponding declaratory relief with respect to each Class as a whole.

137.   This action satisfies the requirements of Fed. R. Civ. P. 23(b)(3) because a class action is superior to other available methods for the fair and efficient adjudication of this controversy. The common questions of law and of fact regarding Defendants' conduct and responsibility predominate over any questions affecting only individual Class members.

138.   Because the damages suffered by each individual Class member may be relatively small, the expense and burden of individual litigation would make it very difficult or impossible for individual Class members to redress the wrongs

done to each of them individually, such that most or all Class members would have no rational economic interest in individually controlling the prosecution of specific actions, and the burden imposed on the judicial system by individual litigation by even a small fraction of the Class would be enormous, making class adjudication the superior alternative under Fed. R. Civ. P. 23(b)(3)(A).

139.   The conduct of this action as a class action presents far fewer management difficulties, far better conserves judicial resources and the parties' resources, and far more effectively protects the rights of each Class member than would piecemeal litigation. Compared to the expense, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation, the challenges of managing this action as a class action are substantially outweighed by the benefits to the legitimate interests of the parties, the court, and the public of class treatment in this court, making class adjudication superior to other alternatives, under Fed. R. Civ. P. 23(b)(3)(D).

140.   Plaintiffs are not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action. Rule 23 provides the Court with authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges. The Court may, on motion of Plaintiffs or on its own determination, the Class or subclasses for claims sharing common legal questions; utilize the

provisions of Rule 23(c)(4) to certify any particular claims, issues, or common questions of fact or law for class-wide adjudication; certify and adjudicate bellwether class claims; and utilize Rule 23(c)(5) to divide any Class into sub-Classes.

141.   Plaintiffs and the Class expressly disclaim any recovery in this action for physical injury resulting from the Inflator Defect without waiving or dismissing such claims. Plaintiffs are informed and believe that injuries suffered in crashes as a result of Defective Airbags implicate the Class Vehicles, constitute evidence supporting various claims, including diminution of value, and are continuing to occur because of Defendants' delays and inaction regarding the commencement and completion of recalls, and because of the` installation of Defective Airbags as replacement airbags. The increased risk of injury from the Inflator Defect serves as an independent justification for the relief sought by Plaintiffs and the Class.

## **REALLEGATION AND INCORPORATION BY REFERENCE**

142.   Plaintiffs reallege and incorporate by reference all of the preceding paragraphs and allegations of this Complaint, including the Nature of Claims, Factual Allegations, Tolling Allegations, and Class Action Allegations, as though fully set forth in each of the following Claims for Relief asserted on behalf of the Class.

## CLAIMS FOR RELIEF

## COUNT 1

## Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 et seq.

143.    Plaintiffs bring this Count against Defendants on behalf of members of the Class.

144.    This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332 (a)-(d).

145.    The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

146.    Each Plaintiff is a "consumer" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). They are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its express and implied warranties.

147.    Defendants are each a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

148.    15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

149.    Defendants provided Plaintiffs and the other Class members with an implied warranty of merchantability in connection with the purchase or lease of

- 69 -

their vehicles that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7). As a part of the implied warranty of merchantability, Defendants warranted that the Class Vehicles were fit for their ordinary purpose as safe passenger motor vehicles, would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

150.    Defendants breached these implied warranties, as described in more detail above, and are therefore liable to Plaintiffs and the Class pursuant to 15 U.S.C. § 2310(d)(1). Without limitation, the Class Vehicles share a common design defect in that they are equipped with Defective Airbags containing the Inflator Defect. Defendants have admitted that the Class Vehicles are defective in issuing its recalls, but the recalls are woefully insufficient to address the Inflator Defect.

151.    Any efforts to limit the implied warranties in a manner that would exclude coverage of the Class Vehicles is unconscionable, and any such effort to disclaim, or otherwise limit, liability for the Class Vehicles is null and void.

152.    Any limitations on the warranties are procedurally unconscionable. There was unequal bargaining power between Defendants, on the one hand, and Plaintiffs and the other Class members, on the other.

153.   Any limitations on the warranties are substantively unconscionable. Defendants knew that the Class Vehicles were defective and would continue to pose safety risks after the warranties purportedly expired. Defendants failed to disclose the Inflator Defect to Plaintiffs and the other Class members. Thus, Defendants' enforcement of the durational limitations on those warranties is harsh and shocks the conscience.

154.   Plaintiffs and each of the other Class members have had sufficient direct dealings with either Defendants or its agents (dealerships) to establish privity of contract.

155.   Nonetheless, privity is not required here because Plaintiffs and each of the other Class members are intended third-party beneficiaries of contracts between Defendants and their dealers, and specifically, of the implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit consumers. Finally, privity is also not required because the Class Vehicles are dangerous instrumentalities due to the aforementioned defect.

156.   Plaintiffs provided written notice of breach to Defendants and a request to cure. Nonetheless, pursuant to 15 U.S.C. § 2310(e), Plaintiffs are entitled to bring this class action and are not required to give Defendants notice

and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiffs pursuant to Rule 23 of the Federal Rules of Civil Procedure.

157.   Furthermore, affording Defendants an opportunity to cure its breach of written warranties would be unnecessary and futile here. At the time of sale or lease of each Class Vehicle, Defendants knew, should have known, or was reckless in not knowing of its misrepresentations concerning the Class Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defective design. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford Defendants a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

158.   Plaintiffs provided written notice of breach of implied warranties and related consumer protection laws, and opportunity to cure, by letters to Defendants.

159.   Plaintiffs and the other Class members would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them. Because Defendants are refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs

and the other Class members have not re-accepted their Defective Vehicles by retaining them.

160.   The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit. Plaintiffs, individually and on behalf of the other Class members, seeks all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial. In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiffs and the other Class members are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiffs and the other Class members in connection with the commencement and prosecution of this action.

161.   Plaintiffs also request, as a form of equitable monetary relief, re-payment of the out-of-pocket expenses and costs they have incurred in attempting to rectify the Inflator Defect in his vehicle. Such expenses and losses will continue as Plaintiffs and Class members must take time off from work, pay for rental cars or other transportation arrangements, child care, and the myriad expenses involved in going through the recall process.

162.   The right of Class members to recover these expenses as an equitable matter to put them in the place they would have been but for Defendants' conduct presents common questions of law. Equity and fairness requires the establishment by Court decree and administration under Court supervision of a program funded by Defendants, using transparent, consistent, and reasonable protocols, under which such claims can be made and paid.

## COUNT 2

### Fraudulent Concealment

163.   Plaintiffs bring this claim against Defendants on behalf of themselves and the members of the Class under the common law of fraudulent concealment, as there are no true conflicts (case-dispositive differences) among various states' laws of fraudulent concealment. In the alternative, Plaintiffs bring this claim against Defendants under the laws of the states where Plaintiffs and Class Members purchased their Class Vehicles.

164.  As described above, Defendants made material omissions and affirmative misrepresentations regarding the Class Vehicles and the Defective Airbags contained therein.

165.  Defendants concealed and suppressed material facts regarding the Defective Airbags—most importantly, the Inflator Defect, which causes, among other things, the Defective Airbags to: (a) rupture and expel metal shrapnel that

tears through the airbag and poses a threat of serious injury or death to occupants; and/or (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag.

166.   Defendants took steps to ensure that its employees did not reveal the known Inflator Defect to regulators or consumers.

167.   On information and belief, Defendants still has not made full and adequate disclosure, continue to defraud Plaintiffs and the Class, and continue to conceal material information regarding the Inflator Defect.

168.   Defendants had a duty to disclose the Inflator Defect because it:

        a.      Had exclusive and/or far superior knowledge and access to the facts, and Defendants knew the facts were not known to or reasonably discoverable by Plaintiffs and the Class;

        b.      Intentionally concealed the foregoing from Plaintiffs and Class Members; and

        c.      Made incomplete representations about the safety and reliability of the Defective Airbags and Class Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

169.   These omitted and concealed facts were material because they would be relied on by a reasonable person purchasing, leasing or retaining a new or used motor vehicle, and because they directly impact the value of the Class Vehicles

purchased or leased by Plaintiffs and the Class. Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer. Plaintiffs and Class Members trusted Defendants not to sell or lease them vehicles that were defective or that violated federal law governing motor vehicle safety, and to uphold its recall obligations under the Sale Agreement and governing laws.

170. Defendants concealed and suppressed these material facts to falsely assure purchasers and consumers that the Defective Airbags and Class Vehicles were capable of performing safely, as represented by Defendants and reasonably expected by consumers.

171. Defendants also misrepresented the safety and reliability of the Defective Airbags and Class Vehicles, because it either (a) knew but did not disclose the Inflator Defect; (b) knew that it did not know whether its safety and reliability representations were true or false; or (c) should have known that its misrepresentations were false.

172. Defendants actively concealed or suppressed these material facts, in whole or in part, to maintain a market for its vehicles, to protect its profits, and to avoid recalls that would hurt the brand's image and cost Defendants money. It did so at the expense of Plaintiffs and the Class.

173.   Plaintiffs and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed or suppressed facts.

174.   Had they been aware of the Defective Airbags installed in the Class Vehicles, and Defendants' callous disregard for safety, Plaintiffs and the Class either would not have paid as much as they did for their Class Vehicles, or they would not have purchased or leased them at all. Plaintiffs and Class members did not receive the benefit of their bargain as a result of Defendants' fraudulent concealment.

175.   Because of the concealment or suppression and/or misrepresentation of the facts, Plaintiffs and the Class sustained damage because they own vehicles that diminished in value as a result of Defendants' concealment of, and failure to timely disclose, the serious Inflator Defect in millions of Class Vehicles and the serious safety and quality issues caused by Defendants' conduct.

176.   The value of all Class members' vehicles has diminished as a result of Defendants' fraudulent concealment of the Inflator Defect, and made any reasonable consumer reluctant to purchase any of the Class Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

177.   Accordingly, Defendants are liable to Plaintiffs and the Class for their damages in an amount to be proven at trial, including, but not limited to, their lost

benefit of the bargain or overpayment for the Class Vehicles at the time of purchase, the diminished value of the Defective Airbags and the Class Vehicles, and/or the costs incurred in storing, maintaining or otherwise disposing of the defective airbags.

178.   Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the Class's rights and well-being, and with the aim of enriching Defendants. Defendants' conduct, which exhibits the highest degree of reprehensibility, being intentional, continuous, placing others at risk of death and injury, and affecting public safety, warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 3

## Negligence

179.   Plaintiffs bring this claim on behalf of themselves and members of the Class under the common law of negligence, as there are no true conflicts (case-dispositive differences) among various states' laws of negligence. In the alternative, Plaintiffs bring this claim against Defendants under the laws of the states where Plaintiffs and Class Members purchased their Class Vehicles.

180.   Defendants owed a duty of care to Plaintiffs and Class members, who were foreseeable end users, to design and manufacture its vehicles so that they

would not be defective or unreasonably dangerous to foreseeable end users, including Plaintiffs and Class members.

181.  Defendants breached their duty of care by, among other things:

a.  Negligently and recklessly equipping the Class Vehicles with Defective Airbags;

b.  Negligently and recklessly failing to take all necessary steps to ensure that its products—which literally can make the difference between life and death in an accident—function as designed, specified, promised, and intended;

c.  Negligently and recklessly failing to take all necessary steps to ensure that profits took a back seat to safety;

d.  Negligently and recklessly failing to take all necessary steps to ensure that the Defective Airbags did not suffer from a common, uniform defect: the use of ammonium nitrate, a notoriously volatile and unstable compound, as the propellant in their inflators; and

e.  Negligently and recklessly concealing the nature and scope of the Inflator Defect.

182.  Defendants' negligence was the direct, actual, and proximate cause of foreseeable damages suffered by Plaintiffs and Class members, as well as ongoing foreseeable damages that Plaintiffs and Class members continue to suffer to this day.

183.   As a direct, actual, and proximate result of Defendants' misconduct, Plaintiffs and members of the proposed Class were harmed and suffered actual damages, which are continuing in nature, including:

a.    the significantly diminished value of the vehicles in which the defective and unreasonably dangerous airbags are installed; and

b.    the continued exposure of Plaintiffs and Class members to an unreasonably dangerous condition that gives rise to a clear and present danger of death or personal injury.

184.  Defendants' negligence is ongoing and continuing, because Defendants continue to obfuscate, not fully cooperate with regulatory authorities, and manufacture replacement airbags that are defective and unreasonably dangerous, suffering from the same serious Inflator Defect inherent in the original airbags that are at issue in this litigation, which poses an unreasonable risk of serious foreseeable harm or death, from which the original airbags suffer.

## COUNT 4

## Unjust Enrichment

185.   Plaintiffs bring this claim on behalf of themselves and the members of the Class under the common law of unjust enrichment, as there are no true conflicts (case-dispositive differences) among various states' laws of unjust enrichment. In


the alternative, Plaintiffs brings this claim under the laws of the states where Plaintiffs and Class Members purchased their Class Vehicles.

186.   Defendants has received and retained a benefit from the Plaintiffs and inequity has resulted.

187.   Defendants benefitted through its unjust conduct, by selling Class Vehicles with a concealed safety-and-reliability related defect, at a profit, for more than these Vehicles were worth, to Plaintiffs, who overpaid for his Vehicle, and/or would not have purchased his Vehicle at all; and who has been forced to pay other costs.

188.   It is inequitable for Defendants to retain these benefits.

189.   Plaintiffs do not have an adequate remedy at law.

190.   As a result of Defendants' conduct, the amount of its unjust enrichment should be disgorged, in an amount to be proven at trial.

## COUNT 5

### Violation of the Michigan Consumer Protection Act,

### Mich. Comp. Laws §§ 445.903 *et seq.*

191.   This claim is brought by Plaintiffs individually and on behalf of the Class against Defendants under the Michigan Consumer Protection Act.   In the alternative, Plaintiffs bring this claim against Defendants under the analogous

consumer protection laws of the states where Plaintiffs and Class Members purchased their Class Vehicles.

192.   Plaintiffs and the Class are "person[s]" within the meaning of the Mich. Comp. Laws § 445.902(1)(d).

193.   At all relevant times hereto, each Defendant was a "person" engaged in "trade or commerce" within the meaning of the Mich. Comp. Laws § 445.902(1)(d) and (g).

194.   The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce . . . ." Mich. Comp. Laws § 445.903(1).   Defendants engaged in unfair, unconscionable, or deceptive methods, acts or practices prohibited by the Michigan CPA, including: "(c) Representing that goods or services have . . . characteristics . . . that they do not have . . . .;" "(e) Representing that goods or services are of a particular standard . . . if they are of another;" "(s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer;" "(bb) Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is;" and "(cc) Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive

manner." Mich. Comp. Laws § 445.903(1). By failing to disclose and actively concealing the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them, Defendants participated in unfair, deceptive, and unconscionable acts that violated the Michigan CPA.

195. In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

196. Defendants have known of the Inflator Defect in the Defective Airbags since at least July 10, 2009 when New GM acquired substantially all of Old GM's books, records, and personnel, and the knowledge about the defective Takata airbags those books, records, and personnel held. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

197.   By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Michigan CPA.   Defendants deliberately withheld the information about the propensity of the Defective Airbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

198.   In the course of their business, Defendants willfully failed to disclose and actively concealed the dangerous risks posed by the Inflator Defect discussed above.   Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

199.   Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiffs and the Class,

- 84 -

about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

200.   Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the Class.

201.   Defendants knew or should have known that their conduct violated the Michigan CPA.

202.   As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.   Defendants' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as "safe" and "reliable", despite their knowledge of the Inflator Defect or their failure to reasonably investigate it.

203.   To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

204.   Defendants owed Plaintiffs and the Class a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

a.    Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b.    Intentionally concealed the foregoing from Plaintiffs and the Class; and/or

c.    Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

205.   Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

206.   Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a

disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

207. Plaintiffs and the Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information. Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs and the Class either would not have paid as much as they did for their vehicles or would not have purchased or leased them at all. Plaintiffs and the Class did not receive the benefit of their bargain as a result of Defendants' misconduct.

208. Defendants' violations present a continuing risk to Plaintiffs and the Class, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest. The recalls and repairs instituted by Defendants have not been adequate.

209. As a direct and proximate result of Defendants' violations of the Michigan CPA, Plaintiffs and the Class have suffered injury-in-fact and/or actual damage.

210. Plaintiffs and the Class seek injunctive relief to enjoin Defendants from continuing their unfair and deceptive acts; monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at

trial and (b) statutory damages in the amount of $250 for Plaintiffs and the Class member; reasonable attorneys' fees; and any other just and proper relief available under Mich. Comp. Laws § 445.911.

211. Plaintiffs and the Class also seek punitive damages against Defendants because they carried out their despicable conduct with willful and conscious disregard of the rights and safety of others. Defendants intentionally and willfully misrepresented the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them, deceived Plaintiffs and the Class on life-or-death matters, and concealed material facts that only they knew—all to avoid the expense and public relations nightmare of correcting a deadly flaw in the Class Vehicles and/or the Defective Airbags installed in them. Defendants' unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

## COUNT 6

## Breach of the Michigan Implied Warranty of Merchantability,

## Mich. Comp. Laws § 440.2314

212. In the event the Court declines to certify a Nationwide Class under the Magnuson-Moss Warranty Act, Plaintiffs bring this claim on behalf of themselves and the members of the Class under the laws of Michigan against Defendants. In the alternative, Plaintiffs bring this claim against Defendants under

the laws of the states where Plaintiffs and Class Members purchased their Class Vehicles.

213.   Each Defendant is and was at all relevant times merchants with respect to motor vehicles and/or airbags within the meaning of Mich. Comp. Laws § 440.2314(1).

214.   A warranty that the Class Vehicles and/or the Defective Airbags installed in them were in merchantable condition was implied by law in Class Vehicle transactions, pursuant to Mich. Comp. Laws § 440.2314.

215.   The Class Vehicles and/or the Defective Airbags installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and airbags are used.   Specifically, they are inherently defective and dangerous in that the Defective Airbags aggressively deploy, and/or violently explode and spray vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents.

216.   Defendants were provided notice of these issues in writing by Plaintiffs, and by their knowledge of the issues, by customer complaints, by numerous complaints filed against them and/or others, by internal investigations, and by numerous individual letters and communications sent by consumers before

or within a reasonable amount of time after Honda issued the first recalls and the allegations of the Inflator Defect became public.

217. As a direct and proximate result of Defendants' breach of the warranties of merchantability, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

## **<u>PRAYER FOR RELIEF</u>**

Plaintiffs, on behalf of themselves and all others similarly situated, requests the Court to enter judgment against Defendants, as follows:

A.    An order certifying the proposed Class, designating Plaintiffs as the named representatives of the Class, designating the undersigned as Class Counsel, and making such further orders for the protection of Class members as the Court deems appropriate, under Fed. R. Civ. P. 23;

B.    A declaration that the airbags in Class Vehicles are defective;

C.    An order enjoining Defendants to desist from further deceptive distribution, sales, and lease practices with respect to the Class Vehicles, and such other injunctive relief that the Court deems just and proper;

D.    An award to Plaintiffs and Class Members of compensatory, exemplary, and punitive remedies and damages and statutory penalties, including interest, in an amount to be proven at trial;

E.      An award to Plaintiffs and Class Members for the return of the purchase prices of the Class Vehicles, with interest from the time it was paid, for the reimbursement of the reasonable expenses occasioned by the sale, for damages and for reasonable attorney fees;

F.      A Defendant-funded program, using transparent, consistent, and reasonable protocols, under which out-of-pocket and loss-of-use expenses and damages claims associated with the Defective Airbags in Plaintiffs' and Class Members' Class Vehicles, can be made and paid, such that Defendants, not the Class Members, absorb the losses and expenses fairly traceable to the recall of the vehicles and correction of the Defective Airbags;

G.      A declaration that Defendants must disgorge, for the benefit of Plaintiffs and Class Members, all or part of the ill-gotten profits they received from the sale or lease of the Class Vehicles, or make full restitution to Plaintiffs and Class Members;

H.      An award of attorneys' fees and costs, as allowed by law;

I.      An award of prejudgment and post judgment interest, as provided by law;

J.      Leave to amend this Complaint to conform to the evidence produced at trial; and

K.      Such other relief as may be appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs

demand a jury trial as to all issues triable by a jury.

Dated:  March 14, 2018                     LIEFF CABRASER HEIMANN &
                                           BERNSTEIN, LLP


                                    By: */s/ Rachel J. Geman*
                                         Rachel J. Geman
                                         rgeman@lchb.com
                                         David Stellings
                                         dstellings@lchb.com
                                         250 Hudson Street, 8th Floor
                                         NY, NY 10012
                                         Telephone:  (212) 355-9500
                                         Facsimile:  (212) 335-9592

                                         Nimish R. Desai
                                         ndesai@lchb.com
                                         275 Battery St., 29th Floor
                                         San Francisco, CA 94111-3339
                                         Telephone: (415) 956-1000
                                         Facsimile: (415) 956-1008

                                         *Counsel for Plaintiff*